BOONE, APPELLANT, *v.* VANLINER INSURANCE COMPANY, APPELLEE.

[Cite as *Boone v. Vanliner Ins. Co.* (2001), 91 Ohio St.3d 209.]

(No. 00–104—Submitted October 18, 2000—Decided April 4, 2001.)

DOUGLAS, J. Appellant, Richard Boone, is an over-the-road truck driver and a resident of Ohio. Appellee, Vanliner Insurance Company ("Vanliner"), issued a commercial vehicle liability insurance policy to Boone, individually, and a separate policy to Boone's employer. Each policy of insurance provided $1,000,000 liability coverage. Boone's employer's policy also provided $1,000,000 uninsured/underinsured motorist coverage and Boone's policy listed uninsured/underinsured motorist coverage in the amount of $50,000.

On June 12, 1995, Boone was in Tampa, Florida, transporting goods for his employer when he was involved in a three-vehicle accident. Boone, driving a tractor-trailer, was travelling behind a dump truck driven by Robert Allison, when Brett Verona, the operator of the third vehicle, lost control while attempting to change lanes. Due to Verona's negligence, Allison was unable to prevent his vehicle from colliding with Verona's. Boone's attempt to avoid hitting Allison's truck was also unsuccessful.

As a result of the accident, Boone suffered serious injuries, including bilateral fractures of both knees. Verona's insurer paid $100,000, the limit of Verona's liability coverage, toward Boone's damages. Boone, alleging that his damages exceeded $100,000, subsequently sought underinsured motorist benefits from Vanliner through his employer's policy of insurance. Vanliner denied Boone's claim, asserting that an exclusion provision in the policy precluded underinsured motorist coverage with regard to Boone's accident.

On June 12, 1997, Boone brought a declaratory judgment action against Vanliner seeking a determination that his policy and his employer's policy of insurance with Vanliner each provided him with $1,000,000 in uninsured/underinsured motorist coverage. With regard to his individual policy, Boone alleged that he was entitled to $1,000,000 uninsured/underinsured coverage by operation of law because Vanliner had failed to obtain a written waiver of uninsured/underinsured coverage in an amount equal to his liability insurance as required by Ohio law. The complaint included a claim for bad faith,[1] alleging that Vanliner lacked reasonable justification for denying underinsured motorist coverage. To support his bad faith claim, Boone sought access, through discovery, to Vanliner's claims file.

In its answer to Boone's complaint, Vanliner denied that Boone was entitled to uninsured/underinsured motorist benefits under either policy. However, Vanliner subsequently changed its position and admitted that each policy of insurance provided Boone with $1,000,000 of uninsured/underinsured motorist coverage. Vanliner subsequently moved the court for a protective order with regard to numerous documents in its claims file. In its motion, Vanliner contended that several documents were protected from discovery by the attorney-client privilege and/or work-product doctrine.[2]

The trial court ordered Vanliner to submit its claims file to the court for an *in camera* inspection to determine which documents, if any, were protected from discovery. The claims file consists of 1,741 documents numbered "0" through "1741."[3] The trial court found that one hundred seventy-five of the documents

---

1. An insurer's lack of good faith in the processing of a claim is frequently referred to as "bad faith." Such conduct gives rise to a cause of action in tort against the insurer. *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph one of the syllabus.

2. The attorney-client privilege exempts from the discovery process certain communications between attorneys and their clients. The privilege has long been recognized by the courts, *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591; *Moskovitz, infra,* 69 Ohio St.3d at 660, 635 N.E.2d at 349, and "[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn* at 389, 101 S.Ct. at 682, 66 L.Ed.2d at 591.

   Work product consists of "documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" and may be discovered only upon a showing of good cause. Civ.R. 26(B)(3). This rule is often referred to as the "work-product doctrine." The purpose of the work-product doctrine is "to prevent an attorney from taking undue advantage of his adversary's industry or efforts." Civ.R. 26(A)(2).

   Vanliner also argued that certain claims file documents were not discoverable because they were not relevant to the bad faith claim. The trial court did not accept this argument and Vanliner did not appeal that aspect of the trial court's ruling.

3. The claims file documents are actually stamped "000000" through "001741." Throughout this opinion reference to specific documents will be by number without the preceding zeros.

were protected from discovery and ordered Vanliner to release the unprotected documents to Boone.[4] In determining which documents were protected, the trial court applied our ruling in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, wherein we held that certain attorney-client communications and work-product materials in an insurer's claims file were not protected from discovery by the attorney-client privilege or work-product doctrine.

Upon appeal[5] to the Tenth District Court of Appeals, Vanliner argued that the trial court erred in applying *Moskovitz* and that, as a result, the trial court incorrectly ordered Vanliner to disclose thirty documents that are protected by the attorney-client privilege and/or work-product doctrine. The court of appeals agreed with Vanliner's argument that *Moskovitz* was inapplicable. Consequently, the court found that of the thirty claims file documents challenged on appeal, Vanliner was required to disclose only one in its entirety. The court accepted Vanliner's argument that the remaining twenty-nine were privileged either in whole or in part. Accordingly, the court of appeals affirmed in part and reversed in part the order of the trial court and remanded the cause to the trial court.[6]

This cause is now before this court pursuant to the allowance of a discretionary appeal.

The issue before us is whether, in an action alleging bad faith denial of insurance coverage, the insured is entitled to obtain, through discovery, claims

---

We also note that there is no document numbered 929 in the claims file. According to Vanliner, this is due to a numbering error.

4. The trial court held that the following documents were protected from discovery: 883, 884, 891, 893–895, 898, 910–928, 930, 932–984, 1015, 1033–1043, 1049, 1051–1077, 1085–1091, 1094–1098, 1101–1102, 1109–1114, 1124–1150, 1251, 1256, 1257, and 1258, and portions of documents numbered 858, 859, 861, and 862.

5. While the issue was apparently not raised by appellant either in the court of appeals or in this court, we note in passing, and without deciding, that there could be a question of whether this case, involving solely a discovery issue, met the requirements for a final appealable order as set forth in R.C. 2505.02(B)(4) and, in particular, (B)(4)(b).

6. Upon the court of appeals' remand of this case to the trial court, the trial court issued a new order, which stated, "Pursuant to the Court of Appeals' Decision rendered December 2, 1999, the Court's November 10, 1998 Entry is hereby modified to indicate that [Vanliner] must produce only the following documents contained in the claims file: 597, 598, 600, and 601 with requested redactions, and 599."

This entry of the trial court is misleading because the order says that it modifies the trial court's order of November 10, 1998, so that only five documents from the insurer's claims file must be produced. However, the trial court's November 10, 1998 entry ordered Vanliner to produce over fifteen hundred claims file documents. Vanliner appealed, and the court of appeals addressed, the trial court's November 10, 1998 order *only with respect to thirty documents*. Thus, the entry upon remand should have reflected that it modified the November 10, 1998 entry only as to those documents at issue in the appeal.

file documents containing attorney-client communications and work product that may cast light on whether the denial was made in bad faith..

As already indicated, the trial court relied on our decision in *Moskovitz* to determine which claims file documents were protected from discovery. In *Moskovitz*, after receiving a substantial jury award for a medical malpractice claim, the plaintiffs sought prejudgment interest as authorized by R.C. 1343.03(C). *Id.*, 69 Ohio St.3d at 647–648, 635 N.E.2d at 340–341. To be successful in an R.C. 1343.03(C) proceeding, the prevailing party of the underlying case must prove, among other things, that the opposing party did not make a good faith effort to settle the case. With regard to this prong of R.C. 1343.03(C), *Moskovitz* sought to clarify the extent of a plaintiff's right to discovery of the malpractice insurer's claims file in light of the attorney-client privilege and the work-product doctrine. We stated that "[d]ocuments and other things showing the lack of a good faith effort to settle by a party or the attorneys acting on his or her behalf are wholly unworthy of the protections afforded by any claimed privilege." *Id.* at 661, 635 N.E.2d at 349. Thus, we held that "[i]n an R.C. 1343.03(C) proceeding for prejudgment interest, neither the attorney-client privilege nor the so-called work product exception precludes discovery of the contents of an insurer's claims file. The only privileged matters contained in the file are those that go directly to the theory of defense of the underlying case in which the decision or verdict has been rendered." *Id.* at paragraph three of the syllabus.

Boone argues that claims file materials showing an insurer's lack of good faith in determining coverage are equally unworthy of protection. Thus, Boone argues that the trial court was correct in applying *Moskovitz* to the claims file documents in this case.

Vanliner, on the other hand, asks us to affirm the court of appeals' decision, which held that *Moskovitz* was not applicable in the present action. The court of appeals found the distinguishing factor between this case and *Moskovitz* to be the status of the underlying claim. Specifically, the court of appeals noted that in the case at bar the underlying claim (underinsured motorist damages) is still pending, whereas in *Moskovitz* the underlying claim (medical malpractice) had already been decided.

We find that the court of appeals, in this regard, misread our decision. Our ruling in *Moskovitz* did not turn on the status of the underlying claim, but rather upon our recognition that certain attorney-client communications and work-product materials were undeserving of protection, *i.e.*, materials "showing the lack of a good faith effort to settle." *Moskovitz* at 661, 635 N.E.2d at 349. Moreover, this "distinction" could easily be eliminated by staying the bad faith claim until the underlying claim has been determined.

Vanliner argues that *Moskovitz* must be viewed in light of our subsequent holding in *State v. McDermott* (1995), 72 Ohio St.3d 570, 651 N.E.2d 985, so that even if our ruling in *Moskovitz* is applicable to attorney-client communications in the present case, *McDermott* requires that they be protected. We disagree.

In *McDermott*, we held that R.C. 2317.02(A) provides the exclusive means by which privileged attorney-client communications can be waived by the client. *Id.* at syllabus. The flaw in Vanliner's argument is that *McDermott* addresses client *waiver* of the privilege, whereas *Moskovitz* sets forth an *exception* to the privilege and is therefore unaffected by our holding in *McDermott*.

Vanliner further contends that if insureds alleging bad faith are able to access certain attorney-client communications within the claims file, then insurers will be discouraged from seeking legal advice as to whether a certain claim is covered under a policy of insurance. This argument is not well taken because it assumes that insurers will violate their duty to conduct a thorough investigation by failing, when necessary, to seek legal counsel regarding whether an insured's claim is covered under the policy of insurance, in order to avoid the insured later having access to such communications, through discovery.

Vanliner further argues that the release of the documents at issue in this case will undermine its ability to defend on the underlying underinsured motorist claim that remains pending. We find this argument unpersuasive. If this were a legitimate concern, we believe that Vanliner would have moved the trial court to stay the bad faith claim, severing it from the underlying underinsured motorist claim. Our review of the record in this case reveals that Vanliner took no such action.

Like the trial court, we find that the rationale behind our holding in *Moskovitz* is applicable to actions alleging bad faith denial of coverage. That is, claims file materials that show an insurer's lack of good faith in denying coverage are unworthy of protection. It appears, however, that in determining which documents were protected in this case, the trial court applied the specific holding in *Moskovitz*, *i.e.*, only those documents containing attorney-client communications and work product that go directly to the theory of defense of the underlying claim are protected. We find this holding inapplicable in the present case because, while the lack of a good faith effort to settle involves conduct that may continue throughout the entire claims process, a lack of good faith in determining coverage involves conduct that occurs when assessment of coverage is being considered. Therefore, the only attorney-client and work-product documents that would contain information related to the bad faith claim, and, thus, be unworthy of protection, would have been created prior to the denial of coverage.

For the foregoing reasons, we hold that in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials

containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage. At that stage of the claims handling, the claims file materials will not contain work product, *i.e.*, things prepared in anticipation of litigation, because at that point it has not yet been determined whether coverage exists. Of course, if the trial court finds that the release of this information will inhibit the insurer's ability to defend on the underlying claim, it may issue a stay of the bad faith claim and related production of discovery pending the outcome of the underlying claim.

We now turn to the specific documents at issue herein. Out of the 1,741 documents contained in the claims file, the issue before us concerns only twenty-nine documents, namely documents numbered 581, 582, 597, 598, 600, 601, 676, 677, 885, 886, 887, 888, 889, 890, 892, 896, 899, 900, 902, 903, 904, 905, 906, 907, 1106, 1107, 1151, 1152, and 1153. Although the trial court ordered Vanliner to produce over fifteen hundred claims file documents, Vanliner's appeal sought to protect only thirty of these documents and was successful as to twenty-nine.

The court of appeals found, and we agree, that the trial court's ruling was inconsistent with respect to eight claims file documents. Specifically, the trial court ordered Vanliner to produce documents numbered 597, 598, 600, and 601 *without* Vanliner's requested redactions but ordered Vanliner to produce documents numbered 858, 859, 861, and 862 *with* the requested redactions. This was inconsistent because the information ordered to be redacted from documents numbered 858, 859, 861, and 862 was identical to the information requested to be redacted from 597, 598, 600, and 601.

We do not agree, however, with the court of appeals' approach to resolving this inconsistency. The court found that "[d]ocuments 597, 598, 600 and 601 are simply duplicates of documents 858, 859, 861 and 862" and held that "[s]ince these documents are duplicates, the trial court erred in not ordering similar redactions of 597, 598, 600 and 601." [7] From this statement it would appear that the content of these documents was not independently evaluated and that it was assumed that because the trial court ordered the information to be redacted in some documents its mistake was in not ordering the same information redacted in others. We find this analysis flawed because it does not consider the possibility that the trial court's mistake was actually in permitting the redaction of the information.

Upon review of these documents in light of our foregoing holding, we find that two of them, namely, documents numbered 600 and 601, should be released *without* redactions to Boone. These documents were created prior to the denial

---

7. The court of appeals' statement that "[d]ocuments 597, 598, 600 and 601 are simply duplicates of documents 858, 859, 861 and 862" is not correct. While the information contained in the portions Vanliner requested to be redacted is the same in document number 597 as in 862, 598 as in 861, 600 as in 859, and 601 as in 858, the documents themselves are not duplicates of each other.

of coverage and the information that Vanliner requested be redacted in these two documents, some of which reflects attorney-client communication, relates to the issue of insurance coverage. Therefore, documents numbered 600 and 601 should be produced without redactions (which makes the redactions ordered in documents numbered 858 and 859 moot).

Documents numbered 597 and 598 contain the name of an attorney with the language "We can explore with atty Maddox" and "Check with atty Maddox." These documents were communications, it would appear, between two of Vanliner's claims employees. Vanliner's attorney was, apparently, not involved in these communications on the issue in question. Therefore, we find that documents numbered 597 and 598 do not contain attorney-client communications. Consequently, the information contained in these documents is not protected by the attorney-client privilege and should be disclosed without redactions (which makes the redactions ordered in documents numbered 861 and 862 moot).

As to the remaining documents at issue in this appeal, those documents contain attorney-client communications and/or work product that were created after coverage was denied. They are, therefore, protected from discovery.

Accordingly, for the foregoing reasons, we affirm in part and reverse in part the judgment of the court of appeals, and remand this cause.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. The majority today adopts a wholesale exception to the attorney-client privilege in actions alleging bad-faith denial of insurance coverage. The majority concludes that "claims file materials that show an insurer's lack of good faith in denying coverage are unworthy of protection." Because the majority's broad holding diminishes the attorney-client privilege without a reasoned basis for doing so, I dissent.

The majority cites no authority for the proposition that attorney-client communications leading to a denial of insurance coverage are not protected from disclosure in a subsequent action alleging bad faith. Instead, the majority relies on *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, which allowed discovery of otherwise privileged materials in an R.C. 1343.03(C) proceeding seeking prejudgment interest. The *Moskovitz* court supported its

decision by declaring documents showing lack of good-faith effort to settle "wholly unworthy" of any privilege. *Id.* at 661, 635 N.E.2d at 349.

The majority extends the *Moskovitz* rationale to this case, deciding that claims file materials showing an insurer's lack of good faith in denying coverage are similarly unworthy of protection by the attorney-client privilege. But the "unworthy of protection" rationale espoused by the majority was unsupported in *Moskovitz* and is unsupported now.

The attorney-client privilege "is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States* (1998), 524 U.S. 399, 403, 118 S.Ct. 2081, 2084, 141 L.Ed.2d 379, 384, quoting *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591; see, also, *In re Klemann* (1936), 132 Ohio St. 187, 190–191, 7 O.O. 273, 275, 5 N.E.2d 492, 493–494. Although the privilege may suppress relevant evidence, its existence is justified by the perceived long-term social benefits of open communication between lawyer and client. See 1 Rice, Attorney–Client Privilege in the United States (2 Ed.1999) 18, Section 2:3. The law will not allow the privilege, however, when the attorney-client relationship is abused. *Id.* at 22–24, Section 8:2; see, also, *Clark v. United States* (1933), 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993, 1000. Accordingly, there is a well-established "crime-fraud exception," which denies the protection of the privilege when the client communicates with an attorney for the purpose of committing or continuing a crime or fraud. *State ex rel. Nix v. Cleveland* (1998), 83 Ohio St.3d 379, 383, 700 N.E.2d 12, 16. Communications in furtherance of a crime or fraud do not further the goals of the attorney-client privilege and are therefore undeserving of protection. See *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983* (C.A.2, 1984), 731 F.2d 1032, 1038.

With its "unworthy of protection" rationale, the majority effectively equates an insurer's communications with its attorney prior to a denial of coverage, in any case alleging bad faith, with communications in furtherance of a civil fraud. But bad faith by an insurer is conceptually different from fraud. Bad-faith denial of insurance coverage means merely that the insurer lacked a "reasonable justification" for denying a claim. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus. In contrast, an actionable claim of fraud requires proof of a false statement made with intent to mislead. See *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus. Proof of an insurer's bad faith in denying coverage does not require proof of any false or misleading statements; an insurer could, for example, act in bad faith by denying coverage without explanation. *Freedom Trust v. Chubb Group of Ins. Cos.* (C.D.Cal.1999), 38

F.Supp.2d 1170, 1173. Because bad faith is not inherently similar to fraud, there is no reason why an allegation of bad faith should result in an exception to the attorney-client privilege akin to the crime-fraud exception. *Id.*

The majority's holding is also startling for its practical effect. After today's decision, an insured need only *allege* the insurer's bad faith in the complaint in order to discover communications between the insurer and the insurer's attorney. Not even an allegation of the crime-fraud exception's applicability carries such an absolute entitlement to discovery of attorney-client communications. In order to overcome the attorney-client privilege based on the crime-fraud exception, a party must demonstrate "a factual basis for a showing of probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance of the crime or fraud." *Nix*, 83 Ohio St.3d at 384, 700 N.E.2d at 16. The rule created today requires no similar prima facie showing of bad faith before an insured is entitled to discover attorney-client communications of the insurer. The result of the majority's decision is a categorical exception to the attorney-client privilege applicable in *any* case alleging a bad-faith denial of insurance coverage. This is a sweeping exception that a number of courts have refused to adopt.[8] The majority has simply decided that insurance-bad-faith cases should be treated differently as far as the attorney-client privilege is concerned, ignoring that "[t]he nature of the relationship, not the nature of the cause of action, controls whether communications between attorney and client can be discovered." *Palmer v. Farmers Ins. Exch.* (1993), 261 Mont. 91, 108, 861 P.2d 895, 906.

Deeming the insurer's communications unworthy of the attorney-client privilege is also inconsistent with the very purpose of the privilege. As noted previously, the privilege is designed to encourage open discussion between attorney and client, so as to promote the observance of the law and allow an attorney to adequately advise the client. With today's decision, the majority declares that an insurer's consultation with an attorney prior to a denial of coverage does not fall within this purpose. The rule laid down today assumes

---

8. See, *e.g.*, *Dion v. Nationwide Mut. Ins. Co.* (D.Mont.1998), 185 F.R.D. 288, 294 (applying Montana law); *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.* (D.Mass.1997), 173 F.R.D. 7, 11 (applying Massachusetts law); *Dixie Mill Supply Co., Inc. v. Continental Cas. Co.* (E.D.La.1996), 168 F.R.D. 554, 558 (applying Louisiana law); *Tackett v. State Farm Fire & Cas. Ins. Co.* (Del.1995), 653 A.2d 254, 259–260 (declining to create a "per se waiver" of privilege in bad-faith cases); *Aetna Cas. & Sur. Co. v. San Francisco Superior Court* (1984), 153 Cal.App.3d 467, 476–477, 200 Cal.Rptr. 471, 477 (that insurer's "state of mind" is at issue in bad-faith action does not justify an exception to privilege); *Hartford Fin. Serv. Group, infra*, 717 N.E.2d at 1235–1236 (relying on *Aetna* to reject exception to privilege in bad-faith cases). See, also, *Maryland Am. Gen. Ins. Co. v. Blackmon* (Tex.1982), 639 S.W.2d 455, 458 ("if a plaintiff attempting to prove the validity of a claim against an insurer could obtain the insurer's investigative files merely by alleging the insurer acted in bad faith, all insurance claims would contain such allegations").

that an insurer will always have some sinister intent to act in bad faith when it discusses a coverage decision with its attorney. But the majority overlooks the fact that an insurance company may consult with legal counsel to obtain legal advice about a coverage decision. "[A]n insurance company's retention of legal counsel to interpret the policy, investigate the details surrounding the damage, and to determine whether the insurance company is bound for all or some of the damage, is a 'classic example of a client seeking legal advice from an attorney.'" *Hartford Fin. Serv. Group, Inc. v. Lake Cty. Park & Recreation Bd.* (Ind.App. 1999), 717 N.E.2d 1232, 1236, quoting *Aetna Cas. & Sur. Co. v. San Francisco Superior Court* (1984), 153 Cal.App.3d 467, 476, 200 Cal.Rptr. 471, 476. These types of communications further the purpose of the attorney-client privilege and should be protected in the same manner as a communication by any other client seeking legal advice from an attorney.

An insurance company that seeks legal advice from an attorney about a coverage issue will now have to consider the possibility that those communications will be subject to future disclosure in the event that coverage is denied and the insured commences a bad-faith lawsuit. As one appellate court has observed, a rule such as the one announced today threatens the open and honest discourse between attorney and client that the privilege is supposed to protect:

"[A]n insurance company should be free to seek legal advice in cases where coverage is unclear without fearing that the communications necessary to obtain that advice will later become available to an insured who is dissatisfied with a decision to deny coverage. A contrary rule would have a chilling effect on an insurance company's decision to seek legal advice regarding close coverage questions, and would disserve the primary purpose of the attorney-client privilege—to facilitate the uninhibited flow of information between lawyer and client so as to lead to an accurate ascertainment and enforcement of rights." *Aetna*, 153 Cal.App.3d at 474, 200 Cal.Rptr. at 475; see, also, *State ex rel. United States Fid. & Guar. Co. v. Montana Second Judicial Dist. Court* (1989), 240 Mont. 5, 13, 783 P.2d 911, 916. The majority's decision here discounts these concerns based on its unsupported "unworthy of protection" rationale.

For these reasons, I cannot join the majority's unsound decision to declare a whole species of communications undeserving of protection by the attorney-client privilege. I would treat bad-faith cases no differently from any other case and regard attorney-client communications as privileged when those communications satisfy all elements of the privilege. This would not mean, of course, that an insurer would *never* have to disclose the substance of attorney-client communications in bad-faith cases. An exception to the attorney-client privilege already exists, for example, when an attorney jointly represents both the insured and the insurer. When an attorney has represented the common interests of insurer and

insured, one joint client (the insurer) cannot assert the privilege in litigation against another joint client (the insured). *Netzley v. Nationwide Mut. Ins. Co.* (1971), 34 Ohio App.2d 65, 77–78, 63 O.O.2d 127, 134–135, 296 N.E.2d 550, 561–562; *Palmer,* 261 Mont. at 108, 861 P.2d at 905.[9] Moreover, if an insured asserting a bad-faith claim makes a prima facie showing of *fraudulent* conduct, the crime-fraud exception may allow piercing the attorney-client privilege as to certain claims file materials. See *Barry v. USAA* (1999), 98 Wash.App. 199, 205, 989 P.2d 1172, 1176. Courts have also recognized that an insurer in a bad-faith case may impliedly waive the privilege altogether by raising an advice-of-counsel defense, thereby placing its attorney-client communications directly at issue. *Palmer,* 261 Mont. at 110, 861 P.2d at 907; *Transamerica Title Ins. Co. v. Santa Clara Cty. Superior Court* (1987), 188 Cal.App.3d 1047, 1053, 233 Cal.Rptr. 825, 829. Unlike the majority's rationale, these limitations on the attorney-client privilege are well supported and consistent with the policy behind the privilege.

I would affirm the judgment of the court of appeals and accordingly dissent.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

———————————

*Blue, Wilson & Blue* and *Richard H.H. Troxell,* for appellant.

*Frost & Maddox Co., L.P.A.,* and *Mark S. Maddox,* for appellee.

*Robert P. Rutter,* urging reversal for *amicus curiae,* the Ohio Academy of Trial Lawyers.

———————————

9. Bad-faith cases involving the joint-client exception often arise after an insured becomes liable for a judgment in excess of the insured's liability policy limits and later sues the insurer for failure to settle within the policy limits. See *Palmer,* 261 Mont. at 108, 861 P.2d at 905. During the course of the underlying litigation between the insured and the third party, the insurer has typically engaged an attorney to defend the insured. Thus, an attorney has represented two clients (insured and insurer) who theoretically shared a common interest, *i.e.,* defending a claim against a third party. This exception would not apply to a case alleging bad-faith denial of uninsured/underinsured motorist ("UM/UIM") coverage. In UM/UIM claims, the insured claimant and the insurer are in adversarial positions from the outset: while the insured's interest is in obtaining UM/UIM coverage, the insurer's interest is inevitably aligned with that of the alleged third-party tortfeasor. *Id.* at 108, 861 P.2d at 905–906. This adversarial relationship would render communications between the insurer and its attorney concerning a UM/UIM claim protected by the attorney-client privilege for purposes of the insured's bad-faith suit. *Id.,* 261 Mont. at 108, 861 P.2d at 906; *Barry v. USAA* (1999), 98 Wash.App. 199, 205, 989 P.2d 1172, 1176; see, also, 1 Rice, Attorney–Client Privilege in the United States (2 Ed.1999) 148, Section 4:29 ("If the interests of the insured and insurer become adverse, their joint communicant status ceases"); Developments in the Law— Privileged Communications (1985), 98 Harv.L.Rev. 1450, 1527 (noting that the attorney-client privilege "rests on assumptions of adverseness that underlie the American judicial system").

220

(No. 98–1074—Submitted November 14, 2000—Decided April 4, 2001.)

PFEIFER, J.   On the morning of January 19, 1994, a partially clad male body was found in Woodland Cemetery in Cleveland.   Two weeks later, the body was identified as that of Ronald Lally of Elyria.   Over a year later, the grand jury indicted defendant-appellant, Stanley E. Jalowiec, for aggravated murder, with firearm and death-penalty specifications.   The indictment alleged that Jalowiec purposely killed Lally to prevent him from testifying in criminal proceedings, which had been scheduled to begin on January 19, 1994.   Subsequently, a jury found Jalowiec guilty as charged, and he was sentenced to death.

In June 1993, Ron Lally contacted the Elyria police to volunteer as a police informant.   Lally signed an agreement to become a confidential informant for the Elyria police and agreed to make controlled drug buys.   On June 7, 1993, with the assistance of Officer Scott Ashley and Detective Alan Leiby, Lally made a controlled drug buy of crack cocaine from Danny Smith and his father Raymond Smith while wired with a hidden monitoring device.   As a result of the controlled buy, police arrested both Raymond Smith and Danny Smith in August 1993 and charged them with aggravated drug trafficking.   Both cases were eventually set for trial on January 19, 1994.

On January 18, 1994, the evening before the murder, Brian Howington and Jalowiec went to several bars in downtown Elyria.   (Howington knew Jalowiec because Jalowiec used to visit Howington's aunt, Joann Corrine Fike, when Howington lived with her.)   Jalowiec then asked Howington to accompany him to a friend's house on Middle Avenue.   There, Howington met Ron Lally and his roommate, and the four of them smoked crack cocaine.   Around 11:30 p.m., Jalowiec, Howington, and Lally went to Fike's house and "[s]hot pool, partied some more."

About an hour later, Jalowiec got a page and asked Howington if he could borrow Fike's car, a Chrysler LeBaron convertible.   Though Howington was hesitant, he relented after Jalowiec persisted.   Around 1:00 a.m., Jalowiec and

Lally left Fike's house in the LeBaron. The next time Howington saw the car was around 5:00 a.m. when Jalowiec and Raymond Smith returned it to Fike's apartment. At that time, the car was covered with ice, and Jalowiec and Smith told Howington that the car had been washed. Fike testified that Jalowiec told her that he had washed the car because there was blood on it as a result of a fight he had had with someone at Mom's Open Kitchen.

Sharon Hopkins testified that she was at Razzle's bar in Elyria one night in January 1994 with her brother, Terry Hopkins, Raymond Smith, Danny Smith, Michael Smith (another son of Raymond), and several others, including Jalowiec. The group stayed at Razzle's until it closed and then, without Jalowiec, went to eat at Mom's Open Kitchen until around 2:45–3:00 a.m.

After leaving Mom's, Sharon Hopkins rode in Danny Smith's car with several people including Raymond, Danny, and Michael Smith. They traveled on Middle Avenue past the railroad tracks just outside the Elyria city limits and dropped Raymond and Michael Smith off by a wooded area. They drove back over the tracks and pulled into a parking lot. Approximately five to ten minutes later, a convertible drove over the tracks to where they had dropped off Raymond and Michael Smith. Danny Smith said, "That is it."

Several minutes later, the convertible drove by again heading toward town, and Danny Smith's car began to follow it. Shortly thereafter, Danny Smith signaled the convertible to pull over and ducked down in the front passenger seat while telling Sharon Hopkins to get out and ask the people in the convertible whether they had picked up Michael Smith. Sharon Hopkins saw Jalowiec get out of the driver's seat of the convertible. Jalowiec responded that Michael Smith was in the car. Although Sharon Hopkins could not see the other occupants, she could tell that there were four people inside the convertible. Danny Smith then drove Sharon Hopkins home.

Later that morning, at around 3:30–4:00 a.m., Danny Smith arrived back at his apartment. Terry Hopkins arrived a little later and noticed that Danny Smith was "nervous and said he was feeling sick to his stomach." Danny Smith told Hopkins that "they had done it, they did it." Hopkins then went back to his sister's apartment across the street from Danny Smith's apartment. Later, Hopkins visited Danny Smith again and also saw Jalowiec, Raymond Smith, and Michael Smith. Jalowiec said, "They stomped him and ran him over with a car." The others there indicated that "they shot him and cut him." According to Hopkins, they were "[k]ind of like bragging about it." Danny Smith told Hopkins they wanted this person killed because he had worn "a wire on him on a drug sale."

At approximately 9:55 a.m. on January 19, 1994, Cleveland homicide detective Michael Beaman was summoned to Woodland Cemetery. A male body had been

found on a cemetery roadway. Some of the victim's clothing was nearby in a snow bank. There was no identification on or near the victim and police did not learn the identity of the victim, Lally, until a few weeks later.

Dr. Heather Raaf, a forensic pathologist with the Cuyahoga County Coroner's Office, performed the autopsy on Lally. Dr. Raaf testified that teeth in Lally's mouth had been knocked out by a gunshot. Dr. Raaf estimated that Lally had sustained at least eleven blows to his head and that his injuries were consistent with being stomped or struck by a vehicle several times. Dr. Raaf determined that Lally's death resulted from a gunshot wound to the head and multiple blunt impacts to the head.

The drug trafficking cases against Danny and Raymond Smith were subsequently dismissed because Lally, the primary witness in both cases, was dead.

After an extensive police investigation, the grand jury indicted Jalowiec on March 8, 1995, for aggravated murder with a firearms specification. In addition, a death-penalty specification alleged that Jalowiec purposely killed Lally in order to prevent his testimony as a witness in a criminal proceeding.

At trial, the key witness for the prosecution was Michael Smith, son of Raymond Smith[1] and brother of Danny Smith. Michael Smith contacted Detective Leiby in April 1994 because he was bothered about having witnessed the Lally murder. During Raymond Smith's murder trial, Michael Smith had been unavailable to testify, and the prosecution proffered testimony from him that had been elicited in a deposition. *State v. Smith* (2000), 87 Ohio St.3d 424, 428, 721 N.E.2d 93, 102. However, at Jalowiec's trial, Michael Smith testified as a prosecution witness.

Michael Smith testified that, purely by chance, he had met his father and brother at Mom's Open Kitchen around 2:30 a.m. on the night of the murder. Raymond Smith had made a phone call and indicated to Michael Smith that he was going to leave. Michael agreed to go with his father and left with him and his brother, Danny Smith. The Smiths and Danny Smith's girlfriend got in Danny Smith's car and both Raymond and Michael Smith were dropped off on Middle Avenue. Raymond and Michael waited outside in the cold, even though Michael had no idea what they were waiting for. The LeBaron driven by Jalowiec with Lally as a passenger pulled up to them and stopped. Raymond Smith told Lally to get in the back seat, and Michael Smith got in the back seat on the driver's side. Raymond Smith sat in the passenger side front seat and made introductions.

---

1. We affirmed the death sentence of Raymond Smith in *State v. Smith* (2000), 87 Ohio St.3d 424, 721 N.E.2d 93.

Shortly thereafter, Raymond Smith brandished a gun and told Lally, "Don't make any sudden moves." The group stopped to buy gas, beer, and cigarettes, then drove on Route 2 toward Cleveland. Raymond Smith asked Lally, "Why did you set my son up?" Lally denied doing so, but appeared to be scared. Smith then told Lally, "We are going to give you some money, get you a bus ticket, you are going to get out of town."

During the trip into Cleveland, all four men were smoking crack cocaine. Lally agreed to leave town, and they drove to East Cleveland to buy some crack for Lally's trip. However, they saw police cars and fire trucks in the neighborhood and decided to drive back towards downtown Cleveland. As they drove, Raymond Smith directed Jalowiec to pull the LeBaron into a Cleveland cemetery.

Inside the cemetery, Raymond Smith got out of the car, put the gun to Lally's face, and ordered him out of the car. He then told Lally, "You will never snitch on nobody again." Michael Smith heard a gunshot and then heard Lally exclaim: "You shot me in my head, you shot me in my head." Raymond then told Michael and Jalowiec to get out and assist him. Jalowiec got out of the car, but Michael remained inside the car and did not look out. He heard "thumps like hitting" and heard Lally plead, "I won't tell nobody, please don't kill me, please don't kill me."

Michael Smith testified that after about two to five minutes of quiet, he could tell that the trunk had been opened and that his father and Jalowiec were trying to put something in the trunk. He heard someone say, "He ain't going to fit, * * * he is too stiff," then he heard something drop. Then Raymond Smith and Jalowiec got back in the car, and Jalowiec started the car and put it in reverse. According to Michael Smith, when Lally's body stopped the car from going any further, Jalowiec drove forward a short distance and then put the car into reverse. Michael Smith could feel the car hit something. Jalowiec did this three times and then drove out of the cemetery.

As they drove from the cemetery, Raymond Smith began arguing with Michael Smith: "This is for your brother, why didn't you get out and help?" While driving back to Elyria, Raymond took his gun apart and threw it out the window, piece by piece. Upon arriving in Elyria, they dropped Michael Smith off at Danny Smith's apartment.

Linda Luke, a forensic serologist in the coroner's office, conducted tests on stains found on the trunk liner of the Chrysler LeBaron. Luke testified that the DNA in Lally's blood sample was consistent with the blood found on the trunk liner.

After deliberation, the jury found Jalowiec guilty as charged.

At the mitigation hearing, Jalowiec made an unsworn statement. Other witnesses also testified on Jalowiec's behalf, including his former live-in girlfriend

and several family members, including both of his parents. The prosecution presented seven witnesses in rebuttal.

The jury recommended death, and the court sentenced Jalowiec to death. The court of appeals affirmed the convictions and death sentence. The cause is now before this court upon an appeal as of right.

Jalowiec has raised thirteen propositions of law. (See appendix.) We have reviewed each and have determined that none justifies reversal of appellant's conviction for aggravated murder. We have also independently weighed the aggravating circumstance against the mitigating factors and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

## VOIR DIRE ISSUES

*Defendant in Shackles.* In Proposition of Law IV, Jalowiec argues that his conviction must be reversed because the trial court failed to remedy or address the issue of prospective jurors' viewing him in shackles during voir dire. Jalowiec relies on *Holbrook v. Flynn* (1986), 475 U.S. 560, 568–569, 106 S.Ct. 1340, 1345–1346, 89 L.Ed.2d 525, 534, for the proposition that due process is violated when jurors view restraints on a defendant absent some essential state interest. Jalowiec further asserts that both the court and the prosecutor displayed a "cavalier attitude" to the incident.

Defense counsel brought the matter to the court's attention at the beginning of voir dire, stating, "[T]here were several potential jurors standing in the hall going to and out of the restrooms and they did see Mr. Jalowiec handcuffed." Defense counsel moved for a mistrial. The prosecutor suggested that some sort of voir dire should take place before the court ruled on the motion. The trial court overruled the mistrial motion and told defense counsel: "Certainly you have the opportunity to inquire of the prospective jurors as to whether or not they have been prejudiced because of this, okay?"

In his original brief to the court of appeals, Jalowiec did not raise this issue. Subsequently, defense counsel filed a lengthier brief to proffer issues they would have raised had the court granted their motion to exceed the page limit. The court of appeals ordered it stricken. Within the stricken brief, Jalowiec raised the issue that prospective jurors observed shackles on him. We conclude that this issue was waived because it was not properly raised before the court of appeals. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

Additionally, we conclude that Jalowiec has failed to demonstrate prejudicial error. Defense counsel asserted that some prospective jurors saw Jalowiec handcuffed, but never followed up on it. The court suggested that defense counsel use voir dire to discover any possible prejudice, but counsel failed to do so. Thus, no prejudice is demonstrated on the record.

Even if some potential jurors saw Jalowiec handcuffed on the first day of voir dire, the danger of prejudice to Jalowiec was slight, since the juror's view of Jalowiec in custody was brief, inadvertent, and outside the courtroom. See *State v. Kidder* (1987), 32 Ohio St.3d 279, 285–286, 513 N.E.2d 311, 318; and *State v. Landrum* (1990), 53 Ohio St.3d 107, 118, 559 N.E.2d 710, 724. See, also, *State v. Richey* (1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, 921. Finally, nothing in the record suggests that the court or prosecutor treated this matter with a "cavalier attitude." Accordingly, we reject Proposition of Law IV.

*Improper Exclusion of Jurors.* In Proposition of Law VI, Jalowiec argues that he was deprived of a fair trial and an impartial jury because several jurors were improperly excused based on their views of the death penalty. Specifically, Jalowiec claims that the court improperly excluded prospective jurors Porter, Eubanks, Kowalski, Fobell, and Buck.

In the court of appeals, Jalowiec raised the issue of improper excusal only for prospective jurors Porter and Eubanks. Therefore, Jalowiec has waived claims of error concerning Kowalski, Fobell, and Buck. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

Prospective juror Porter questioned the ability of anyone to impose a death sentence, based on the Bible. She first indicated that she could not consider death as a sentencing option. Porter later said several times, unequivocally, that she could vote for a death sentence but then said she could not sign a death warrant. The trial court did not abuse its discretion in excusing Porter, since her views on the death penalty would have substantially impaired her performance as a juror. *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

Prospective juror Eubanks initially indicated that he could "probably" sign a death verdict. Upon further questioning, he equivocated, then indicated that his death-penalty views would substantially impair his ability to fairly consider a death sentence, then equivocated again. The excusal for cause of prospective juror Eubanks was not an abuse of discretion.

Based on the foregoing, we reject Proposition of Law VI.

## GUILT–PHASE ISSUES

*Coconspirators' Extrajudicial Statements.* In the first part of Proposition of Law I, Jalowiec argues that under *Bruton v. United States* (1968), 391 U.S. 123,

88 S.Ct. 1620, 20 L.Ed.2d 476, he was prejudiced and denied his right to confront and cross-examine witnesses when the prosecutor mentioned during opening statement that Raymond Smith had implicated Jalowiec in the Lally murder. While Jalowiec concedes that counsel failed to object to the statement, he asserts that it was plain error under *Bruton.*

Jalowiec's failure to object waived all but plain error. See, *e.g., State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 925. In addition, the issue was not raised before the court of appeals. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

The prosecutor's brief reference to Raymond Smith's statement did not constitute plain error. It does not appear that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. The trial court instructed the jury at the outset that opening statements are not evidence. Unlike the situation in *Bruton,* the statement in issue was not elicited during testimony. The remark, which was not even objected to, did not deny Jalowiec a fair trial. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O 3d 362, 373 N.E.2d 1244, paragraph one of the syllabus. Accordingly, we reject this portion of Proposition of Law I.

Under Proposition of Law II, Jalowiec asserts that the state failed to make a prima facie case of a conspiracy in the Lally murder independent of out-of-court statements by alleged coconspirators. Therefore, he contends that the court erred in failing to exclude, over defense objections, several out-of-court statements made by Danny Smith.

The trial court overruled Jalowiec's objections, based on Evid.R. 801(D)(2), which provides that hearsay does not include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." We recognized in *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus, that "[t]he statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." See, also, *State v. Lindsey* (2000), 87 Ohio St.3d 479, 481, 721 N.E.2d 995, 1000–1001.

Independent evidence established that a conspiracy to kill Lally existed on the night of his murder based on the testimony of Michael Smith and on Sharon Hopkins's and Howington's testimony that Jalowiec arranged to get Lally in the car with Raymond Smith. Sharon Hopkins testified about events that occurred within hours of the murder, including where she was with Raymond, Danny, and Michael Smith, and that she heard from Jalowiec that Michael Smith was in the LeBaron. Brian Howington testified that he was with Jalowiec and Lally on the

night of the murder, and that Jalowiec and Lally left in the LeBaron around 1:00 a.m. Michael Smith's testimony implicated Jalowiec, Raymond Smith, and Danny Smith in the Lally murder. Michael Smith confirmed that Jalowiec, Raymond Smith, and Danny Smith made arrangements to get Lally into the car, before Lally would have a chance to testify against them.

Evidence at trial also indicated that the conspiracy began as early as September 15, 1993. Lally told Elyria police officer Homoki at Mr. Hero's in Elyria that both Jalowiec and Danny Smith had threatened him. This occurred a month after Raymond Smith and Danny Smith had been arrested as a result of Lally's controlled drug buy. While at Mr. Hero's, Lally told Officer Homoki that "these individuals" had threatened his life because he was going to testify against them. Danny Smith had also pointed to Lally at that time and said: "That snitch will get his."

Accordingly, the following statements by Danny Smith were made in the course of, and in furtherance of, the conspiracy. Lynne Altpater testified that Danny Smith asked her, about a month before Lally's murder, for some poison for someone who was "going to testify against him." Carl Hartman testified that in November 1993, Danny Smith offered him a BMW and cash to make sure "Ron didn't make it to the stand," but when Hartman refused, Danny Smith told him that "Stanley and his dad" would do it for him.

Sandra Williams testified that Danny Smith told her that "it would be a shame if anything happened to [Lally's] family" or to her. He also said that he knew that Lally's family "lived in a trailer and it would be a shame if it got blowed up." Testimony about threats is not hearsay. Evid.R. 801(C) and Comment.

Terry Hopkins testified that on the morning of the murder, Danny Smith told him "they did it" and that Jalowiec told him, "They stomped him and ran him over with a car." Further, he testified that Jalowiec and Raymond and Danny Smith were "[k]ind of like bragging about" murdering Lally and that Danny Smith stated that he wanted the person killed because "he had wore a wire on him on a drug sale." Testimony of bragging by the Smiths tended to implicate them, not Jalowiec, and thus was harmless, even if not admissible as statements against interest or statements of coconspirators.

We find that the prosecution established a prima facie case of conspiracy. The early admission of statements that could have been deemed hearsay at the time they were elicited was rendered harmless, since independent proof of the conspiracy was admitted into evidence before the case was submitted to the jury. *Carter*, 72 Ohio St.3d at 550, 651 N.E.2d at 972; see, also, *Smith*, 87 Ohio St.3d at 433–435, 721 N.E.2d at 106–107. We reject Proposition of Law II.

*Sufficiency of Evidence.* In Proposition of Law III, Jalowiec contends that the trial court erred in failing to grant his motion for acquittal under Crim.R. 29.

Specifically, Jalowiec asserts that there was no evidence that any element of the crime was committed in Lorain County and that venue in Lorain County was therefore improper. Jalowiec also argues that there was insufficient evidence to prove prior calculation and design.

When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.E.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The verdict will not be disturbed unless the reviewing court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Id.* at 273, 574 N.E.2d at 503.

With regard to Jalowiec's claim of improper venue, we held in *State v. Beuke* (1988), 38 Ohio St.3d 29, 526 N.E.2d 274, paragraph one of the syllabus: "When an offender commits offenses in different jurisdictions as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof. (R.C. 2901.12[H].)" Venue is not a material element of any crime but is a fact that must be proven beyond a reasonable doubt. *State v. Headley* (1983), 6 Ohio St.3d 475, 477, 6 OBR 526, 528, 453 N.E.2d 716, 718. However, R.C. 2901.12(G) provides: "When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, *but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any such jurisdiction.*" (Emphasis added.)

The testimony by Officer Homoki concerning the threats made to Lally by Jalowiec and Danny Smith and the events culminating in Lally's being taken out of Lorain County with Jalowiec and Raymond and Michael Smith indicate that a conspiracy had been formed prior to the murder. The evidence shows that those events were orchestrated and supports the prosecution's claim that prior calculation and design occurred in Lorain County.

Michael Smith testified that after he and his father got in the LeBaron driven by Jalowiec, Raymond Smith brandished a gun and told Lally not to make any sudden moves. As they drove toward Cleveland, Raymond Smith repeatedly asked Lally why he "set my son up."

Yet Michael Smith also testified that Smith told Lally that they were going to put him on a bus to leave town and that "everything got a little more comfortable" in the car while the four of them drank beer and smoked crack. Michael Smith testified that they drove to East Cleveland to buy crack for Lally to take on his trip. Although this evidence could be considered to somewhat negate the

state's argument that prior calculation and design was formed in Lorain County, the trier of fact could have concluded that the conspirators were simply engaged in a subterfuge to relax Lally.

Subsequently, Raymond Smith directed the car into Woodland Cemetery in Cleveland and told Lally: "You will never snitch on nobody again." After Raymond Smith shot Lally, Jalowiec got out of the car and helped him beat Lally. After leaving Lally in the cemetery road, Jalowiec attempted to drive the LeBaron over Lally's body several times.

In our view, the evidence at trial indicated that the whole sequence of events leading up to Lally's murder, including prior calculation and design, occurred in both Lorain and Cuyahoga Counties. As was true in the case involving Jalowiec's coconspirator, see *State v. Smith*, 87 Ohio St.3d at 435–436, 721 N.E.2d at 107–108, the jury could have reasonably found that prior calculation and design by Jalowiec took place in Lorain County. As in *Smith*, the jury could have reasonably concluded that getting Lally in the car ostensibly to ride to Cleveland to buy crack, as well as the plan to have Lally take a bus out of town, was merely a ruse to enable them to kill him in an area where his corpse could not be identified. In sum, we find that the trial court did not err in denying Jalowiec's Crim.R. 29 motion for acquittal on grounds of improper venue or in failing to demonstrate prior calculation and design. Therefore, we reject Proposition of Law III.

*Gruesome Photographs.* In Proposition of Law XI, Jalowiec asserts error in the admission of gruesome, prejudicial, and cumulative photographs.

Under Evid.R. 403, the admission of photographs and similar evidence is left to the sound discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. *Id.* at paragraph seven of the syllabus.

Jalowiec does not specify that any particular photographs were cumulative. He merely argues that since there was no dispute as to the cause of death, the gruesome photographs, as a whole, were inadmissible. However, "[t]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." *Maurer*, 15 Ohio St.3d at 265, 15 OBR at 401, 473 N.E.2d at 792.

State exhibits 1–A through 1–Q are photographs of the crime scene where Lally's body was discovered. Several were admitted into evidence without objection. State exhibits 1–G and 1–I through 1–M were admitted over defense objections. Any alleged error in the admission of the photographs that were not objected to is waived.

Of the seventeen crime scene photographs, only three appear to be grisly. Each of these photographs corroborated the testimony of Cleveland detective Michael Beaman, who investigated the Lally homicide on the extremely cold morning of January 19, 1994. These photographs also helped to establish the intent of the killers and the "nature and circumstances of the crimes." *State v. Reynolds* (1998), 80 Ohio St.3d 670, 677, 687 N.E.2d 1358, 1367. State exhibit 1–F shows the victim lying face down on the cemetery road with a wound to his left shoulder. State exhibit 1–G, which the court warned the jury was gruesome, shows the victim's face covered with blood and snow and a large wound on his neck. State exhibit 1–H depicts Lally's chest covered with blood.

The other crime scene photographs show various items of evidence found at the scene. State exhibits 1–L and 1–M depict tire tracks running through a large bloodstain. The photographs also corroborate the testimony of Michael Smith, who was a witness to the murder. Four photographs showing the body lying across the road are repetitive but are not gruesome, so there is no prejudice. None of the rest of these crime scene photographs is repetitive.

State exhibits 2–A through 2–CC are twenty-seven photographs taken around the time of Lally's autopsy.[2] Jalowiec objected to the admission of all autopsy photographs because of their gruesome and repetitive nature. The trial court overruled his objections and admitted them into evidence.

Admittedly, several of these photographs are gruesome. Each one corroborates the testimony of Dr. Raaf, who performed the autopsy on Lally. The cumulative effect of several repetitive autopsy photographs was harmless. In addition, the photographs illustrated the extent of the beating that Lally sustained and the attempts made by Jalowiec to run over his body with a car, and the photographs were relevant by illustrating witness testimony and forensic evidence. *Maurer*, 15 Ohio St.3d at 265–266, 15 OBR at 401–402, 473 N.E.2d at 791–792. Accordingly, we overrule Proposition of Law XI.

*Jury Instructions.* In Proposition of Law XIII, Jalowiec argues that it was impossible to reconcile the specific-intent requirement of former R.C. 2903.01(D), 139 Ohio Laws, Part I, 3–4, and the charge given to the jury. He asserts that the overall jury charge was so confusing that one simply cannot find that the jury was clearly instructed. However, Jalowiec's failure to object to the instruction waived all but plain error.

The portion of the jury charge that Jalowiec claims is in conflict with former R.C. 2903.01(D) provided:

" 'Cause' is an essential element of the offense charged in Count One.

---

2. There are no photographs in the record marked state exhibits 2–D or 2–V.

" 'Cause' is an act, or a failure to act, which in the natural and continuous sequence directly produces the death, and without which it would not have occurred.

" 'Cause' occurs when the death is the natural and foreseeable result of the act, or the failure to act.

"The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act, or failure to act.

"The Defendant is also responsible for the natural and foreseeable consequences or results that follow, in the ordinary course of events, from the act or failure to act."

We have stated that "[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Here, the overall charge indicated that the jury was required to find specific intent to kill and prior calculation and design before it could convict Jalowiec of aggravated murder. The instruction on foreseeable consequences does not constitute error, let alone plain error, since other instructions given by the court limited any prejudicial effect. *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866, 883. Accordingly, Proposition of Law XIII is overruled.

## SENTENCING ISSUES

*Rebuttal Testimony.* In Proposition of Law XII and in the second part of Proposition of Law I, Jalowiec asserts that he was prejudiced by the state's presentation of rebuttal witnesses during the mitigation phase. Jalowiec contends that under the guise of rebuttal, the state presented numerous witnesses who testified as to other crimes committed by Jalowiec. Jalowiec submits that this testimony was essentially evidence of nonstatutory aggravating circumstances.

At the mitigation hearing, Jalowiec gave an unsworn statement, during which he also responded to questions from defense counsel. During his unsworn statement, Jalowiec chronicled his problems with rheumatoid arthritis, its effects on him, and how it prevented him from holding a job for very long. He spoke about the relationship he had with the children of his girlfriend and how he had developed a father-son relationship with her son, Derrick. Jalowiec denied being involved with threatening or wanting to kill Lally, stating, "I had nothing to do with this." He also denied having a crack problem and asserted that there were no pending drug cases against him.

At that point, away from the jury, the defense indicated that it was going to rest if the trial court thought it had not opened the door for rebuttal by the prosecution. The court overruled the defense motion to prevent rebuttal by the state on the grounds that Jalowiec had brought out a character trait, that "[h]e is a great guy," that could be rebutted under Evid.R. 404(A)(1), in particular with evidence of prior crimes of violence.

After this, the court permitted Jalowiec to continue with his unsworn statement. Jalowiec then admitted that he had pending charges brought against him for felonious assault, menacing, arson, aggravated drug trafficking, and possessing drug paraphernalia. The first three charges related to bar fights in which Jalowiec was involved, but he denied any guilt. With regard to the charges of drug trafficking, Jalowiec claimed that he did not "know, really know, what this is all about" and further claimed that the drug charges had been brought in an attempt to compel him to testify against others in the homicide investigation.

The defense then called a number of other witnesses, including relatives, who testified that Jalowiec was "great" with children, that he fainted at the sight of blood, that he "loved kids," that he would not go hunting and "wouldn't kill a thing," that he did not start the bar fight that led to the menacing charge or fight back, and that he was a "fun loving kid" who "loved animals" and loved kids and people.

In response, the state produced seven rebuttal witnesses who testified that Jalowiec sold crack cocaine, that he had a crack pipe that fell out of his pants leg when he was pulled over on a traffic stop, that he hit someone with a baseball bat outside a bar, causing almost $20,000 in medical bills to the victim, that he bragged about kicking the same bar-fight victim in the face, and that he caused injuries to another victim of the same bar fight, resulting in hospitalization and $10,000 worth of medical bills.

In *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, we held that "counsel for the state at the penalty stage of the capital trial may introduce * * * (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant." Accord *State v. Raglin* (1998), 83 Ohio St.3d 253, 261, 699 N.E.2d 482, 490.

Here, Jalowiec denied knowledge of any legitimate basis as to why particular drug trafficking charges had been brought against him. He called several witnesses to testify about what a good person he was.

The trial court has discretion to determine what relevant evidence is admissible as proper rebuttal. *State v. Dunlap* (1995), 73 Ohio St.3d 308, 316, 652 N.E.2d 988, 996. In discharging its burden to prove that the aggravating circumstance outweighs the mitigating factors, the prosecution may rebut mitigation evidence. *State v. DePew* (1988), 38 Ohio St.3d 275, 285–286, 528 N.E.2d 542, 554.

Similar to the situation in *State v. McNeill* (1998), 83 Ohio St.3d 438, 446–447, 700 N.E.2d 596, 605–606, Jalowiec opened the door to rebuttal. This rebuttal evidence tended to show that Jalowiec was capable of strenuous physical activity, that he sold drugs, and that he severely beat victims in the bar fights that led to the charges against him. The trial court did not err in permitting the prosecution to rebut Jalowiec's unsworn statement or witnesses. The rebuttal testimony did not amount to the introduction of nonstatutory aggravating circumstances. See *Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus.

Jalowiec argues under the second part of Proposition of Law I that the out-of-court statements of Raymond Smith, which were elicited during the rebuttal testimony of Detective Alan Leiby in the mitigation phase, prejudiced him. Jalowiec also contends that the trial court improperly admitted two taped confessions of Smith, the second one implicating Jalowiec, at the mitigation phase.

During his unsworn statement, Jalowiec testified, "I had no reason to kill that man." He stated, "Detective Leiby specifically set me up and he made some comments in the newspaper, to the Chronicle, and one of the comments was that it was impossible for him to get 15 people to lie against us." Jalowiec also stated, "I really didn't have nothing to do with this, that it was a family thing and I am not part of the Smith family."

In rebuttal, Detective Leiby testified that Raymond Smith told him on the telephone that Jalowiec was involved in the Lally murder. Smith was trying to help his son Danny Smith work out a deal to avoid six counts of drug trafficking. Smith gave a taped statement at police headquarters describing the events leading up to Lally's death at the cemetery. He claimed that Lally had the gun and that Lally had kidnapped him. He did not mention Jalowiec's name at that time. Later, Smith phoned Detective Leiby and told him that the other person in the cemetery was Jalowiec.

Given the case law cited in our discussion of Proposition of Law XII, *DePew* and *McNeill*, *supra*, Jalowiec's mitigation evidence, especially his denials of involvement in the Lally murder, opened the door to this rebuttal evidence.

However, the admission of the two taped statements of coconspirator Raymond Smith was erroneous, since both tapes constituted inadmissible hearsay. Jalowiec's failure to object to their admission waived all but plain error. In this instance, no plain error occurred, since the improper admission of the tapes was not outcome-determinative in light of the abundant evidence presented against Jalowiec. Any prejudicial impact this evidence may have had on the sentencing phase can be cured by our independent review of the sentence. *State v. Dennis* (1997), 79 Ohio St.3d 421, 432, 683 N.E.2d 1096, 1106. Therefore, we reject the second part of Proposition of Law I.

*Sentence Appropriateness.* In Proposition of Law VII, Jalowiec challenges the appropriateness of his death sentence. The appropriateness of this sentence will be evaluated in connection with our independent sentence evaluation.

*Proportionality Review.* In Proposition of Law VIII, Jalowiec argues that the proportionality review that we conduct is not the one established in R.C. 2929.05 and is fatally flawed, since it does not include cases where a life sentence was imposed. We disagree. Proportionality review entails comparing only cases where a sentence death is imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 123–124, 31 OBR 273, 284, 509 N.E.2d 383, 395. Accordingly, we reject Proposition of Law VIII.

*Jury Instructions.* In Proposition of Law IX, Jalowiec criticizes the trial court's penalty-phase jury instructions. Jalowiec essentially argues that the following instruction required that the jury reject the death penalty before it considered the life sentences, an instruction proscribed in *State v. Brooks* (1996), 75 Ohio St.3d 148, 160, 661 N.E.2d 1030, 1041:

"You should recommend the sentence of death if you unanimously, that is, all twelve of you, find by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors.

"If you do not so find, you shall unanimously (all twelve) recommend either a life sentence with parole eligibility after serving twenty years of imprisonment, or a life sentence with parole eligibility after serving thirty years of imprisonment."

Jalowiec's failure to object to this instruction waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. The instruction does not constitute plain error. See *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d 484, 496; *State v. Goff* (1998), 82 Ohio St.3d 123, 128–129, 694 N.E.2d 916, 921–922; *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 531. Unlike in *Brooks,* 75 Ohio St.3d at 159, 661 N.E.2d at 1040, the jury in this case was not told that it had "to determine unanimously that the death penalty was inappropriate before you can consider a life sentence." Instead, "[t]he jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty." *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95.

Jalowiec complains that the court referred to aggravating circumstances (plural) when he was charged with only one aggravating circumstance. However, the state moved the trial court to correct the transcript because the court reporter had informed the prosecutor that "in computerized transcription, the word circumstance is automatically typed in as circumstances." On June 24, 1997, the trial court granted the state's motion to correct the record. But the transcript itself was not corrected, and the plural appears throughout. The plural noun often has a singular verb, however, corroborating the claim of error in transcrip-

tion. Moreover, the trial court instructed the jury on only one aggravating circumstance, and the verdict forms set forth only one aggravating circumstance for the jury to consider.

Jalowiec points out that the trial court erred in instructing the jury on all statutory mitigating factors, including factors that were not relevant. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1036, fn. 3, and *State v. DePew*, 38 Ohio St.3d at 289, 528 N.E.2d at 557. This did not, however, constitute plain error. See *Bey*, 85 Ohio St.3d at 498, 709 N.E.2d at 496.

Last, Jalowiec argues that the jury was provided no guidance on how to proceed. Specifically, Jalowiec contends that the court's instruction on weighing essentially compelled a death sentence. The trial court instructed:

"The Prosecutor has the burden to prove, beyond a reasonable doubt, that the aggravating circumstances [*sic*] which the Defendant was found guilty of outweighs the factors in mitigation of imposing the death sentence.

" 'To outweigh' means to weigh more than, to be more important than.

"The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances [*sic*] outweighs the mitigating factors."

We conclude that the instruction complies with R.C. 2929.03. Based on all the foregoing, we reject Proposition of Law IX.

*Effective Assistance.* In Proposition of Law V, Jalowiec claims that he was denied effective assistance of trial counsel. To gain reversal of a conviction for ineffective assistance, "[f]irst, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

The record does not support a finding that Jalowiec was prejudiced, that is, that there was "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

Jalowiec identifies five areas where counsel were allegedly deficient.

First, Jalowiec complains that "during voir dire counsel failed to rehabilitate favorable jurors and failed to timely object to unfounded challenges by the State." Although Jalowiec does not provide any specific examples or citations to the record, he is apparently referring to the excused jurors mentioned under Proposition of Law VI. As previously discussed, none of the juror excusals challenged in that proposition was improper. Moreover, we have repeatedly held that counsel is in a much better position to determine whether jurors could have

been rehabilitated than can a reviewing court. *E.g.*, *Phillips*, 74 Ohio St.3d at 85–86, 656 N.E.2d at 659; *Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d at 381.

Second, Jalowiec claims that he was prejudiced because counsel failed to object to the admission of his coconspirator's statements on tapes that implicated him in the murder. Defense counsel specifically declined to object to this evidence at the close of the mitigation phase. As discussed under Proposition of Law XII, the admission of the two taped statements of Raymond Smith was improper. Counsel should have objected to these tapes. However, their admission did not affect the outcome of Jalowiec's sentencing determination. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

Third, Jalowiec argues that he was prejudiced by counsel's failure to request an expert to assist them in determining the cause of death. The deputy coroner, Dr. Heather Raaf, testified that Lally's injuries were consistent with being stomped or struck by a vehicle several times. On cross-examination, Dr. Raaf stated that she did not find any tire or boot tread markings on Lally's corpse. Because of this, Jalowiec claims that counsel were deficient in failing to request their own expert witness.

However, Dr. Raaf did not testify that there were no markings on Lally's body; rather, she testified that there were no tread markings found on the body. Had counsel requested an expert on cause of death, the request might not have been granted. The appointment of defense experts is within the sound discretion of the trial court. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. Jalowiec has failed to demonstrate how such an expert would have aided his defense or that there was a basis for requesting an expert. See *State v. Mason* (1998), 82 Ohio St.3d 144, 150, 694 N.E.2d 932, 943–944. In sum, Jalowiec has not demonstrated how he was prejudiced by counsel's failure to seek expert assistance.

Fourth, Jalowiec claims deficient representation because counsel (1) failed to object to the instruction on all statutory mitigating factors, (2) failed to object to the lack of a sympathy instruction, (3) failed to object to the instruction on consideration of life sentences, (4) failed to request a definition of the term "mitigation" at the penalty phase, and (5) failed to object to the guilt phase instruction that the "Defendant is charged as a principal offender."

The decision not to request a sympathy instruction was appropriate, since sympathy is irrelevant to sentencing and no instruction on it need be given. See *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687. Counsel did not err in failing to object to the instruction supposedly requiring consideration of the death penalty before life sentences, because, as discussed under Proposition of Law IX, the instruction did not violate *Brooks*, 75 Ohio St.3d at 160, 661 N.E.2d at 1041.

The failure to request an instruction defining the term "mitigation" did not prejudice Jalowiec. The absence of instructions on the concept of mitigation does not violate the Eighth and Fourteenth Amendments to the United States Constitution. *Buchanan v. Angelone* (1998), 522 U.S. 269, 275–277, 118 S.Ct. 757, 761–762, 139 L.Ed.2d 702, 709–710. The instructions here did not foreclose the jury's consideration of any mitigating evidence, since the court directed the jury to "consider all of the evidence." *Id.*, 522 U.S. at 277, 118 S.Ct. at 762, 139 L.Ed.2d at 710; *Goff*, 82 Ohio St.3d at 131, 694 N.E.2d at 923.

Counsel's failure to object to the instruction on Jalowiec's being charged as a principal offender was harmless. The court properly defined principal offender as part of the complicity instruction. This case involved the specification of killing to prevent testimony under R.C. 2929.04(A)(8); it did not involve the felony-murder specification of R.C. 2929.04(A)(7), where determination of principal-offender status may be critical. See *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316.

Fifth, Jalowiec contends that counsel were ineffective in permitting the defendant to make an unsworn statement, which resulted in a ruling that the prosecutor could rebut it. However, counsel's decision to have Jalowiec make an unsworn statement did not fall "below an objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Counsel's decision was in the nature of trial strategy. With little mitigating evidence to offer, counsel decided to let Jalowiec speak to the jury in the hope of avoiding the death penalty. We ordinarily refrain from second-guessing strategic decisions made by counsel at trial, even where counsel's strategy was questionable, *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192, and even though appellate counsel essentially argue that they would have defended differently. *Mason*, 82 Ohio St.3d at 169, 694 N.E.2d at 956.

Based on the foregoing, we reject Proposition of Law V.

*Constitutionality.* In Proposition of Law X, Jalowiec argues that Ohio's death-penalty scheme violates both the state and federal Constitutions on numerous grounds. As we have before, we summarily reject these arguments. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. See *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *Steffen*, 31 Ohio St.3d at 125, 31 OBR at 285–286, 509 N.E.2d at 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; and *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633.

## INDEPENDENT REVIEW AND PROPORTIONALITY

In Proposition of Law VII, Jalowiec asserts that his death sentence should be reversed as inappropriate, especially since during mitigation the state was able to introduce evidence of other crimes of which he had been accused. As discussed under Propositions of Law I and XII, Jalowiec opened the door to this rebuttal testimony when he denied his guilt, denied having any drug charges pending against him, and generally portrayed himself as a good person.

Among other evidence, the testimony that Jalowiec and Danny Smith threatened Lally at the Mr. Hero's restaurant, that Danny Smith secured his father and Jalowiec to ensure that "somebody didn't make it to the stand," and that Jalowiec participated in the murder of Lally to prevent him from testifying in the Smith drug trials, combined to prove the single aggravating circumstance beyond a reasonable doubt. Upon independent assessment, we conclude that the evidence supports beyond a reasonable doubt the aggravating circumstance of R.C. 2929.04(A)(8).

The nature and circumstances of the offense provide nothing in mitigation. Jalowiec and Raymond Smith beat Ron Lally to death. That Smith participated and shot Lally does not mitigate the appropriate punishment.

Jalowiec's history, character, and background provide some mitigating features. Several witnesses testified on Jalowiec's behalf, including his parents, sister, and grandfather, and a former girlfriend. Ray Pasterczyk told how Jalowiec helped him do odd jobs around his house while he recuperated from knee-replacement surgery. Jackie Chaffin, Jalowiec's former live-in girlfriend, stated that Jalowiec was her oldest son Derrick's "best friend" and that Jalowiec continued to give him presents and cards, even when she and Jalowiec were not living together. Chaffin recounted how Jalowiec regularly took Chaffin's youngest son, Cody, who had numerous medical problems, to therapy, and that he would baby-sit Derrick too. Chaffin described Jalowiec as "great with my children" and stated that he "never caused trouble for me."

Nancy Morrison, a friend of Jalowiec and his family, testified that Jalowiec "loved kids" and was always courteous and nice to her. Jalowiec's grandfather, Edward Jalowiec, recounted how Jalowiec worked at his golf course and would help him do other chores. He stated that Jalowiec "wouldn't go hunting with us. He wouldn't kill a thing * * *." He further noted Jalowiec's problems with arthritis and hoped that the jury would spare his life.

Jalowiec's younger sister, Tammy Jalowiec, stated that she had a good relationship with her brother and never had any problems with him. She also spoke of Jalowiec's problems with arthritis and claimed that Jalowiec was the victim in the

bar fight that resulted in criminal charges brought against him. She pleaded with the jury not to sentence Jalowiec to death.

Jalowiec's father, Edward Jalowiec, testified that he got along "real good" with his son. He denied his son's guilt in the arson charge that followed a bar fight. Jalowiec's father also expressed disbelief that his son could have killed anyone, since "he wouldn't even shoot a rabbit."

Jalowiec's mother, Sarah Jalowiec, described her son as someone who always had been "a fun loving kid" and stated that he "loved animals." She confirmed that Jalowiec's rheumatoid arthritis prevented him from holding down a job. Mrs. Jalowiec stated that he "loves people" and asked the jury to spare her son's life.

Jalowiec gave an unsworn statement in which he denied killing Lally and claimed that he and Lally had been friends. He gave a brief life story that included the chronology of his arthritis. He claimed that it prevented him from writing continuously, and that, as a result, he had had to quit high school. He admitted that other criminal charges had been brought against him, which were still pending. In general, Jalowiec denied that he had committed the various crimes alleged in the pending charges and cast himself as a victim who had acted in self-defense.

With regard to the statutory mitigating factors of R.C. 2929.04(B), the fact that the killers and victim were smoking crack cocaine prior to the murder did not place Jalowiec under duress, coercion, or strong provocation under factor two. Factor four, the youth of the offender, has little weight, since Jalowiec was twenty-three years old at the time of the offense. Factor five is relevant, since Jalowiec lacked a significant history of prior criminal convictions or delinquency adjudications. Factor six is not implicated, since Jalowiec participated directly in the killing when he and Raymond Smith beat Lally and when he attempted to drive over Lally's body several times before fleeing the cemetery.

Under factor seven, the catchall factor, several aspects are worthy of weight in mitigation. The love and support that Jalowiec enjoys from his family is entitled to some weight. See, e.g., Mason, 82 Ohio St.3d at 170, 694 N.E.2d at 957. Jalowiec's chronic rheumatoid arthritis is worthy of slight weight in mitigation. The fact that Jalowiec was under the influence of crack cocaine at the time of the offense could also be considered mitigating under this factor. See Sowell, 39 Ohio St.3d at 324–326, 530 N.E.2d at 1299–1300.

Upon independent weighing, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The killing of a witness to prevent his testimony in another criminal proceeding strikes at the heart of the criminal justice system. See State v. Keene (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246, 266–267.

The death penalty imposed in this case is both appropriate and proportionate with the death sentence imposed on Jalowiec's fellow murderer, Raymond Smith, in *Smith*, 87 Ohio St.3d 424, 721 N.E.2d 93, and the sentence given in *Coleman*, 85 Ohio St.3d 129, 707 N.E.2d 476. Both cases involved the single specification of murdering a witness to prevent his testimony in a criminal proceeding. The sentence is also appropriate and proportionate to the sentence imposed in cases with capital specifications in addition to the (A)(8) specification. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902; *State v. Hooks* (1988), 39 Ohio St.3d 67, 529 N.E.2d 429. For these reasons, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

---

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.** While I concur in the portion of the majority's opinion affirming defendant's convictions, I dissent from the decision to uphold the sentence of death because I do not believe that defendant's unsworn statement opened the door to all of the prejudicial information presented by the prosecution in rebuttal.

At the mitigation hearing, defendant made an unsworn statement. Defendant stated that he had a good grade school record and had perfect attendance until he was diagnosed with rheumatoid arthritis when he was twelve or thirteen years old. He told of several odd jobs that he held intermittently when he was able to work.

Defendant told the jury that eventually he met a single mother with one son, and the three moved in together. When defendant's arthritis became so severe that he could no longer work, he stated, he stayed home and took care of his girlfriend's son while she worked. He told the jury that he would clean the house, go for walks with her son and the dog, and spend time with the child, flying kites and doing other activities. Defendant and his girlfriend broke up for a period of time, and she became pregnant while they were apart. Ultimately, defendant and his girlfriend got back together, and he accepted her new baby and helped raise the baby as well. For a short time, defendant went back to work in order to help support both children. However, when it was discovered that the baby was deaf, defendant stated, he quit his job in order to take the baby to various therapy appointments. In general, defendant maintained his innocence of

the murder. Defendant stated that although Danny Smith "caught some drug cases, you know, I didn't catch no drug cases."

Following defendant's unsworn statement, his attorney approached the bench and stated that he was unsure how the court intended to proceed. Counsel stated that if the court felt that he had not opened the door for rebuttal by the prosecution, then that was all that counsel would present in mitigation. When the trial court stated that the prosecutor was entitled to some rebuttal, the prosecuting attorney said that he would rebut defendant's portrayal of himself as a "caring individual who wanted to work, but could not, and cares for these kids." He explained, "I think since he has chosen to put that trait into evidence, it is not a 404(B) or 404(A) problem as much as it is straight out rebuttal of an issue that he chose to put in effect and not in the case in chief."

After the trial court ruled that defendant's unsworn statement could be rebutted under Evid.R. 404(A)(1) and defense counsel knew that the prosecutor would be allowed to bring in evidence of other crimes, counsel decided to put the defendant back on the stand in an attempt to minimize the impact of the evidence by allowing defendant to deliver some of the information himself.

Defendant took the stand for a second time and revealed that although he had no prior criminal felony convictions as an adult, he had been charged with other felonies. Defendant then described that he had been charged with felonious assault in conjunction with a bar fight in 1994. Defendant explained the circumstances of the bar fight and his involvement. He maintained his innocence, stating that he was at a bar in Elyria with a group of people celebrating his sister's friend's birthday when five men in the bar attempted to pick a fight. He claimed that when the bar closed, he and his group left and were outside when he was jumped and assaulted by the men who had bothered him earlier inside the bar. He further opined that the only reason he had been charged was because of the current homicide case.

Defendant further revealed that he had been charged with drug abuse, possession of drug paraphernalia, and aggravated drug trafficking, and he explained the nature of his involvement. Further, defendant stated that he had been charged with menacing and arson. The menacing and arson charges resulted from an incident in which defendant was shooting pool at a bar in Cleveland with some friends. Defendant stated that he approached a young lady and offered to buy her a drink when her boyfriend grabbed him by the throat and choked him until he passed out. Defendant's party was asked to leave, and defendant claims that they went to another bar, where he was again assaulted on the street. A police car pulled up, and the officers ran defendant's name through the computer. They told defendant that someone had pressed charges against him that night for menacing and arson. Defendant explained that the man who

had choked him earlier alleged that when he left the bar, he found his car on fire and accused defendant of setting the fire. Defendant maintained his innocence relating to both the menacing and the arson.

Before defendant left the stand, he asked the jurors not to consider these alleged crimes in their deliberations. He pleaded with them that these were only charged crimes and that the state had not proven that he had committed them. He further reiterated his belief that the reason none of these charged crimes had been brought to trial was that the state had been using the charges as leverage, waiting to see if he would be convicted of the aggravated murder charges. At the conclusion of his remarks, defendant asked the jury to spare his life.

Following defendant's statement, the defense called seven witnesses to testify about defendant's childhood, medical problems, and relationships with the witnesses. Several of the defense witnesses also asked the jury to spare defendant's life. In particular, defendant's mother, father, sister, grandfather, former girlfriend, friend, and former employer testified. Throughout the testimony, the state was permitted to cross-examine the witnesses relentlessly regarding their knowledge or lack thereof regarding the felonious assault, arson, drug, and other charges.

After the extensive cross-examination, the state called seven witnesses in rebuttal. Dennis Cavanaugh, the head of the Lorain County Drug Task Force, testified at length regarding two alleged undercover sales of controlled drugs to the defendant in 1994. Charges related to these sales had been filed against the defendant but had not been brought to trial. Further, Scott Bohac, an informant, testified that he had purchased crack cocaine from defendant in 1994. Detective Scott Sargent testified that in 1994, he observed a crack pipe fall out of defendant's pant leg when he was pulled over for a traffic stop.

Jeff Hicks testified at length about the bar incident that led to the felonious assault charges against defendant. When asked how he knew defendant, Hicks stated that defendant "is the one that took a baseball bat to my face." Hicks testified that he had been hospitalized for three months with an infected jaw as a result of injuries sustained during the bar fight and that his medical bills totaled $20,000. Deanna Butler testified that she heard about the details of the alleged bar fight from a cousin of Jeff Hicks (which was pure hearsay that should not have been admitted), and that later that day she heard defendant bragging about kicking Hicks. Kenneth Roland testified that he was also injured in the 1994 incident in which defendant was alleged to have picked a fight at an Elyria bar. Roland testified that he was in the hospital for three days and sustained medical bills of $10,000. Amazingly, Roland was permitted to testify regarding this alleged incident even though he was unable to positively identify defendant as the man who struck him.

Finally, Detective Alan Leiby testified about investigating the murder. In particular, he testified about plea offers and witnesses. After defense counsel suggested in cross-examination that these charges without convictions were not relevant to the penalty phase and were highly prejudicial, the state on redirect asked Detective Leiby, "Were what he calls the other acts or the mere allegations even relevant until the Defendant took the stand and stated that he loves animals and he hates blood, he is a great guy and he likes kids?" The detective answered, "No." But he admitted on cross-examination that the felonious assault, the drug possession, and the arson charges had nothing to do with the way defendant was alleged to have dealt with children and animals, since those charged crimes all involved adults.

Further, defendant himself did not state that he was a good guy, could not stand the sight of blood, or loved animals, the statements supposedly rebutted with evidence of other charges. These statements came from mitigation witnesses that the defense put on the stand only after the judge ruled that defendant had opened the door to evidence of other crimes and the defense was forced to present testimony regarding those pending charges.

The majority concludes that defendant opened the door to this rebuttal testimony and that the rebuttal testimony did not amount to the introduction of nonstatutory aggravating circumstances as proscribed in *State v. Gumm* (1995), 73 Ohio St.3d 413, 422, 653 N.E.2d 253, 263. Specifically, the majority agrees with the trial court's assessment that this other-acts evidence regarding prior crimes of violence was admissible under Evid.R. 404(A)(1) because defendant brought out a character trait and, in the trial court's opinion, the defendant had portrayed himself as a "great guy" even though defendant never used those words. I strongly disagree.

Evid.R. 404(A)(1) provides:

"(A) Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

"(1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same is admissible * * *."

Because defendant initially stated that he had never had any drug charges, I agree that the defense opened the door to evidence relating to the drug charges. Further, the rebuttal testimony of Detective Leiby was admissible because it primarily covered the murder investigation itself. But I fail to see how the trial court could conclude that defendant had opened the door to the blatantly prejudicial evidence of the felonious assault and arson charges simply by portraying himself, in the court's words, as "a great guy."

I would find that the content of defendant's unsworn statement did not warrant seven rebuttal witnesses testifying with virtually no limitation about crimes of which defendant has never been convicted and which defendant hotly contested. If portraying oneself as a good person can open the door to witness after witness and page after page of such speculative and damaging testimony, then I cannot imagine any case that would not open the door to such evidence. Under the standard used in this case, almost any positive comment a defendant could make about himself or herself would open the door to every possible or even speculative misdeed he or she ever committed or was even alleged to have committed.

The other-acts evidence relating to the felonious assault and arson charges amounted to nothing more than a blatant attempt to discredit a person who up until this point in his life was without a criminal record. In mitigation, defendant's mother, father, grandfather, and sister all testified that they had good relationships with the defendant. Defendant worked until his arthritis prohibited him from doing so. Defendant had a relatively clean background before he was charged with aggravated murder. Moreover, the family vendetta involved the Smiths, not the defendant, and there was no evidence that the victim had ever snitched on defendant. Rather than being an instigator, defendant appeared to have been recruited for the crime. These are all mitigating factors.

Certainly I do not condone defendant's actions in the underlying case. Obviously, he is still just as guilty of murder as Raymond Smith. Thus, he was properly convicted of aggravated murder in the guilt phase of the trial. However, in the mitigation phase of the trial, the jury weighs evidence relating to whether the defendant's life is worth sparing or whether he deserves the death penalty. Therefore, every piece of evidence or testimony, either sympathetic or prejudicial, affects the jury.

Again, while not excusing the murder itself, the fact that defendant was not the leader in the murder could have an impact on the jury. In addition, defendant had a relatively uneventful history prior to the murder. These factors make the evidence of other criminal charges so prejudicial to this defendant. If defendant's background prior to the murder had already seemed to mirror the challenged testimony, the effect would not have been as great. But, in this case, the prejudicial other-acts evidence may have influenced the jury to vote for the death penalty. I would find that these trials within the trial were so prejudicial that they probably affected the jury's decision regarding the sentence and tipped the scale toward death.

None of the testimony rebutted defendant's work history or his claim of inability to hold a job. The prosecution presented no evidence of a false workers' compensation claim. No rebuttal witness testified that he was abusive to his girlfriend or her children or otherwise disputed his caring nature toward his

girlfriend's children or his assistance to her deaf child. Other than testimony relating to defendant's drug charges, none of the testimony was rebuttal at all—it was all new "other acts" which were all only at a "charge" stage—none even reduced to a conviction so as to lend them reliability.

If this type of testimony is allowed, I fear the protections of the Constitution will be irreparably eroded. I respectfully dissent and would vacate the sentence of death and remand to the trial court for a new mitigation hearing that would exclude the testimony relating to the felonious assault and arson charges.

---

## APPENDIX

Proposition of Law I: Appellant Jalowiec's sixth, eight and fourteenth amendment rights as guaranteed by U.S. CONST. were violated by the admission at trial of a co-defendant's confession inculpating the defendant.

Proposition of Law II: Appellant Jalowiec was denied his fifth, sixth, eighth and fourteenth amendment rights as guaranteed by the U.S. Constitution by the admission of statements of a co-conspirator which did not meet the requirements of 801(D)(2)(e) of the Ohio Rules of Evidence.

Proposition of Law III: U.S. CONST., amendments five, six, eight, and fourteen and Article I, Sections 10 and 16 of the OHIO CONST. require that a court grant a motion for judgment of acquittal when the evidence is insufficient to sustain a conviction.

Proposition of Law IV: Jurors viewing a defendant in shackles is a violation of the U.S. CONST., 14th amendments [sic] and Article I, Section 10 of the OHIO CONST.

Proposition of Law V: The ineffective assistance of counsel provided to Appellant violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the fifth, sixth, eighth and fourteenth amendments to the U.S. CONST. and the OHIO CONST.

Proposition of Law VI: The 6th and 14th amend. to the U.S. CONST. and Sections 10 and 16 of the OHIO CONST. guarantee an accused a fair trial and an impartial jury. The improper exclusion for cause of potential jurors because of their views on the death penalty denied appellant Jalowiec these constitutional guarantees.

Proposition of Law VII: The death sentence in appellant Jalowiec's case is unreliable and inappropriate under the 8th and 14th amend. to the U.S. CONST. and Sections 9, 10, and 16, Article I of the OHIO CONST. and R.C. 2929.05.

Proposition of Law VIII: The proportionality review that this court must conduct in the present capital case pursuant R.C. 2929.05 is fatally flawed and,

therefore, the present death sentence must be vacated pursuant to the 5th, 8th, and 14th amend. to the U.S. CONST. and Sections 5 and 10, Article I of the OHIO CONST. and R.C. 2929.05.

Proposition of Law IX: Improper penalty phase jury instructions violate an individuals [*sic*] rights as guaranteed by the U.S. CONST., amend. 5, 6, 8, and 14 and Ohio Const. Article I Section 10.

Proposition of Law X: Ohio's death penalty law, OHIO REV. CODE 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04 and 2929.05 violate U.S. CONST. amend. V, VI, VIII, and XIV and Article I, Sections 1, 2, 5, 9, 10 and 16.

Proposition of Law XI: Appellant Jalowiec was denied his 6th, 8th, and 14th amendment rights as guaranteed by the U.S. CONST. and Sections 8 and 10, Article I of the OHIO CONST. to a fair trial, due process and a reliable determination of his guilt and sentence when gruesome, prejudicial and cumulative photographs were admitted into evidence even though their prejudicial effect outweighed their probative value.

Proposition of Law XII: To allow evidence of nonstatutory aggravating factors during the sentencing phase of appellant's trial violated his rights guaranteed by the U.S. CONST. amend. 6, 8, and 14 and OHIO CONST. Article I, Section 10.

Proposition of Law XIII: The trial court's jury instruction in the fact-finding phase denied petitioner his rights to be free from cruel and unusual punishment, to a fair trial, to the effective assistance of counsel, to a fair and impartial jury and the due process of law under the Fifth, Sixth, Eighth and Fourteenth Amend. to the U.S. CONST. and Article I, Section 10 of the OHIO CONST.

---

*Gregory White,* Lorain County Prosecuting Attorney, and *Jonathan E. Rosenbaum,* Chief Counsel, Criminal Division, for appellee.

*Patricia A. Millhoff* and *Nathan Ray,* for appellant.

THE STATE EX REL. LYNCH, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL.; OHIO STATE UNIVERSITY, APPELLANT.

[Cite as *State ex rel. Lynch v. Indus. Comm.* (2001), 91 Ohio St.3d 246.]

(No. 00–1396—Submitted February 27, 2001—Decided April 4, 2001.)

The judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals.

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

COOK, J., dissenting. Based on the rationale set forth in the decision of the court of appeals' magistrate, I respectfully dissent.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in the foregoing dissenting opinion.

*Philip J. Fulton & Associates* and *Jonathan H. Goodman,* for appellee.

*Betty D. Montgomery,* Attorney General; *Dinsmore & Shohl, L.L.P.,* and *Michael L. Squillace,* Special Counsel, for appellant.

THE STATE EX REL. LONGLOTT, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLEE.

[Cite as *State ex rel. Longlott v. Indus. Comm.* (2001), 91 Ohio St.3d 247.]

(No. 00–1561—Submitted February 27, 2001—Decided April 4, 2001.)

The judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Law Office of Thomas Tootle Co., L.P.A.,* and *Thomas Tootle,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Thomas L. Reitz,* Assistant Attorney General, for appellee.

THE STATE EX REL. HAMMOCK, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Hammock v. Indus. Comm.* (2001), 91 Ohio St.3d 248.]

(No. 00–1589—Submitted February 27, 2001—Decided April 4, 2001.)

The judgment of the court of appeals is affirmed consistent with the opinion of the court of appeals.

MOYER, C.J., RESNICK, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

F.E. SWEENEY, J., dissents and would reverse the judgment of the court of appeals.

*Gallon & Takacs Co., L.P.A.,* and *Theodore A. Bowman,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Dennis L. Hufstader,* Assistant Attorney General, for appellee Industrial Commission of Ohio.

*Kegler, Brown, Hill & Ritter, Timothy T. Tullis* and *David M. McCarty,* for appellee R.R. Donnelley & Sons Co.

THE STATE EX REL. OCCIDENTAL CHEMICAL CORPORATION, APPELLANT,
*v.* BUREAU OF WORKERS' COMPENSATION ET AL., APPELLEES.

[Cite as *State ex rel. Occidental Chem. Corp. v. Ohio Bur.
of Workers' Comp.* (2001), 91 Ohio St.3d 249.]

(No. 99–686—Submitted January 9, 2001—Decided April 11, 2001.)

*Per Curiam.* Diamond Shamrock Corporation ("Diamond") went through significant corporate changes in the 1980s. Two are relevant here: (1) the convoluted merger of Diamond's chemical division into Occidental Chemical Corporation ("Occidental") and (2) a change in workers' compensation insurance status.

In 1983, Diamond changed its corporate structure. A holding company of the same name was formed. Nonchemical operations were transferred to newly created subsidiaries of the new Diamond. The chemical component of old Diamond became a subsidiary of the new Diamond and changed its name to Diamond Shamrock Chemicals Company ("Shamrock Chemicals").

This corporate reorganization presumably prompted a change in the workers' compensation insurance status of the former chemical division. Old Diamond had been self-insured. On July 1, 1984, it canceled its self-insured status, and Shamrock Chemicals, as a result, became a state insurance fund employer. This is significant because in 1986, new Diamond sold Shamrock Chemicals' outstanding stock to a company owned by Occidental Petroleum Corporation. Shamrock Chemicals was again renamed, and on November 30, 1987, was merged into Occidental Chemical Corporation, appellant herein. As part of the merger, Shamrock Chemicals dropped its separate state fund risk number and moved under Occidental's state fund risk.

In 1992, Lewis Tobul, who worked for Diamond from 1941 through 1976, died. His widow alleged that his death was due to chemical exposure at a Diamond plant in Painesville. The Industrial Commission of Ohio awarded death benefits against "Diamond Shamrock Chemical Company C/O Occidental Chemical Corporation." No payments, however, were forthcoming.

While the widow waited, both Occidental and a corporate successor of Diamond, Maxus Energy Corporation, clashed with appellee Bureau of Workers' Compensation—and each other—over responsibility for claims arising while Diamond was self-insured, including Tobul's claim. Occidental argued that because Shamrock Chemicals was insured by the state fund when Occidental bought it, the state fund was the responsible payor. The bureau, however, ruled that companies that changed from self-insured to state fund status retained direct financial responsibility for all claims arising while the company was self-insured—responsibility did not pass to the state fund. Therefore, because (1) the chemical manufacturing portion of Diamond was self-insured during Tobul's injurious chemical exposure; and (2) Occidental was the successor-by-merger of that operation, Occidental, not the state fund, was liable for payment.

The Self–Insured Review Panel of the bureau stressed:

"Both parties [Occidental and Maxus] have expressed their concerns of potentially being assessed self-insured liabilities when they are not self-insured employers. This Panel is in no way attempting to transfer the self-insured status of Diamond Shamrock Corporation to either of these employers. Instead, this panel is attempting to ascertain which party is responsible for the self-insured *liabilities*. Self-insured liabilities, like other corporate liabilities, pass to the successor corporations along with the assets.

"After a review of the statement of facts and testimony elicited at the conference, the Panel finds that Occidental Chemical Co. is the employer responsible for those claims attributable to Diamond Shamrock Chemicals Company. Stated simply: the Panel finds that Occidental Chemical Co. is a successor employer to Diamond Shamrock and is therefore responsible for its self-insuring workers' compensation obligations." (Emphasis *sic*.)

Occidental filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the bureau had abused its discretion in determining that Occidental was responsible for Lewis Tobul's claim. The court of appeals disagreed and denied the writ. This cause is now before this court upon an appeal as of right.

Occidental does not dispute the principle that the responsibilities of the merged corporation are assumed by the surviving entity. See R.C. 1701.82(A)(4); *ASA Architects, Inc. v. Schlegel* (1996), 75 Ohio St.3d 666, 665 N.E.2d 1083. It instead disputes the determination that liability for decedent's claim ever fell within Shamrock Chemicals' self-insured risk.

Occidental argues that because decedent died after Shamrock Chemicals had converted to state fund insurance, expenses related to his death were not Shamrock Chemicals' and, hence, not Occidental's after merger. Occidental

claims that any statutory or regulatory authority for a contrary finding was not enacted or adopted until after the two companies merged.

While Occidental's statutory argument is true, *State ex rel. Marion Power Shovel Co. v. Indus. Comm.* (1950), 153 Ohio St. 451, 41 O.O. 438, 92 N.E.2d 14, substantially preceded the merger and supports the bureau's assessment of liability. That case was precipitated by a situation that is not uncommon to workers' compensation administration—an employer's switch from state fund to self-insured status or vice versa. *Marion Power Shovel* entailed the latter and touched upon a question obvious to the situation—when an employer changes insured status, from what fund do claims that arose before the change continue to be paid? *Marion Power Shovel* ruled that the employer's insured status at the time of injury or injurious exposure controlled. Thus, because the claimant in that case was exposed while the employer was self-insured, the company retained direct responsibility for that claim and could not pass it off to the state insurance fund.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Schottenstein, Zox & Dunn, L.P.A., William J. Barath* and *Robert D. Weisman,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Gerald H. Waterman,* Assistant Attorney General, for appellees.

THE STATE EX REL. BACKUS, APPELLANT, *v.* INDUSTRIAL
COMMISSION OF OHIO, APPELLEE, ET AL.

[Cite as *State ex rel. Backus v. Indus.
Comm.* (2001), 91 Ohio St.3d 251.]

(No. 99–947—Submitted March 14, 2001—Decided April 11, 2001.)

*Per Curiam.* Appellant-claimant Rodney T. Backus has an allowed workers' compensation claim for asthmatic bronchitis. A request for permanent total disability compensation was denied by appellee Industrial Commission of Ohio based on two doctors' reports that found that claimant had no functional limitations due to the allowed conditions and was physically capable of any employment performed in a fume- and dust-free environment.

Claimant later applied for permanent partial disability compensation ("PPD") under former R.C. 4123.57. The commission found a twenty percent PPD, which claimant elected to receive as an award for impaired earning capacity ("IEC") pursuant to former R.C. 4123.57(A). His election was denied by the commission in a lengthy order:

"Claimant has not proved by a preponderance of the evidence that his impaired earning capacity is causally related to the 2/4/85 industrial injury. The medical report[s] of Dr. Hutchison (6/21/93) and Subbiah (1/14/93) both indicate that the claimant has no functional limitations due to the bronchitis and can do any work as long as the environment is free from dust and fume[s]. The Commission order of 11/9/93, denying permanent total disability benefits, concludes that the claimant has no physical restrictions and can do any level of physical labor as long as there is no exposure to dust and fumes.

"Evidence at hearing indicates that the claimant took a disability retirement with the employer on 7/1/97, after 34 years of employment. The facts also indicate that claimant began receiving Social Security retirement benefits sometime in 1995. * * * The Court in *State ex rel. CPC Group, General Motors Corp. v. Indus. Comm.* (1990), 53 Ohio St.3d 209 [211, 559 N.E.2d 1330, 1333], stated that 'R.C. 4123.57(A) requires a comparison of a claimant's pre- and post-injury earning capacity. Consideration of post-injury earning capacity assumes, at a minimum, a desire to earn during the period in which an impairment has been alleged.' In this case, the claimant has not presented any evidence that he had a desire to earn during the period he is alleging an impairment. Claimant's testimony at hearing was unequivocal. He testified that from the date of his disability retirement (7/1/87), to the present (9/23/97), he has not made any attempt to look for work. Claimant further testified that he didn't think anyone would hire him because of his age and physical condition. District Hearing Officer finds that claimant's testimony is in direct conflict with the conclusions set

forth in the Commission's order of 11/9/93. The Commission found [that] the claimant, based on his ability to do any level of physical labor as long as there is no exposure to dust and fumes, as well as his educational background, would be able to do such unskilled sedentary work as a security guard, ticket taker, product inspector, dispatcher and cashier jobs.

"Based on the claimant's testimony District Hearing Officer concludes that the claimant has never made any attempt in the 10 years since his retirement to secure any part-time or full-time employment. Therefore, District Hearing Officer concludes, that claimant's impaired earning capacity is related to his desire not to work, as opposed to the 2/4/85 industrial injury." (Emphasis *sic.*)

Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission had abused its discretion in denying IEC. The court of appeals denied the writ after finding that any IEC was not attributable to claimant's allowed condition. This cause is now before this court upon an appeal as of right.

Former R.C. 4123.57 permitted a successful applicant for permanent partial disability compensation to select the method of payment—as a lump–sum PPD award under former R.C. 4123.57(B) or as weekly IEC compensation under former R.C. 4123.57(A). 138 Ohio Laws, Part I, 1733. Entitlement under the latter is not, however, automatic. A claimant must prove both actual IEC and a causal relationship to his or her allowed conditions. *State ex rel. Johnson v. Indus. Comm.* (1988), 40 Ohio St.3d 384, 533 N.E.2d 775.

"Impaired earning capacity" "connotes not what claimant *did* earn but what he or she *could have* earned." (Emphasis *sic.*) *State ex rel. Eaton Corp. v. Indus. Comm.* (1993), 66 Ohio St.3d 180, 183–184, 610 N.E.2d 992, 995. It is not established by the mere showing of diminished or absent wages. *State ex rel. Gool v. Owens Illinois, Inc.* (1998), 82 Ohio St.3d 178, 694 N.E.2d 962. This is the premise, however, under which claimant proceeds.

Claimant asserts that his injury-induced retirement from his former position of employment establishes a *per se* entitlement to one hundred percent IEC benefits. This is incorrect. Claimant's allowed condition did not force him from the entire labor market—a circumstance that would have established an impaired earning capacity. Instead, his condition merely precluded a return to the former position of employment. The medical reports of Drs. Hutchison and Subbiah demonstrate that claimant has *no* functional limitations due to his allowed conditions that would preclude *any* type of work in a contaminant-free environment. There is, therefore, other remunerative employment of which claimant is physically capable that could either ameliorate or possibly eliminate the lack of income of which claimant now complains. Equally important, claimant has not alleged that he is intellectually or vocationally incapable of other work. Accord-

ingly, the commission did not abuse its discretion in attributing claimant's lack of earnings to claimant's admitted lack of interest in other employment.

The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., dissents and would reverse the judgment of the court of appeals.

---

*Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Craigg E. Gould,* Assistant Attorney General, for appellee.

THE STATE EX REL. COULTER, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLEE, ET AL.

[Cite as *State ex rel. Coulter v. Indus. Comm.* (2001), 91 Ohio St.3d 254.]

(No. 99–1510—Submitted January 30, 2001—Decided April 11, 2001.)

---

*Per Curiam.* Appellant-claimant Roberta C. Coulter suffered two industrial low back injuries in the early 1980s. Two laminectomies followed. After her second surgery in 1982, Dr. Richard M. Ward concluded that claimant could not return to her former job as a nurse's aide.

Claimant worked a series of jobs thereafter with periods of work interspersed with allegedly injury-induced absences. In 1985, claimant moved appellee Industrial Commission of Ohio for determination of a percentage of permanent partial

disability ("PPD") under former R.C. 4123.57. The commission assessed a ten percent PPD. Given the choice of receiving compensation as a lump sum PPD award under former R.C. 4123.57(B) or as weekly compensation for impaired earning capacity ("IEC") pursuant to former 4123.57(A), claimant selected the first option.

Claimant's work continued to be only intermittent until late 1990, and her income reflected it. Claimant has apparently not worked since November 29, 1990, allegedly due to injury.

In 1997, claimant sought to change her election of compensation. A district hearing officer denied the change for lack of good cause. A staff hearing officer ("SHO"), in a confusing order, reversed the finding of no good cause, but sustained the denial of compensation nonetheless after concluding that claimant did not have an actual IEC:

"Pursuant to [State ex rel.] Simpson v. Indus. Comm. (1991), 62 O.S.3d 162 [580 N.E.2d 779], the transformation of a nonwork-preventive injury into a work-prohibitive one is changed circumstances sufficient to be considered unforeseen changed circumstances. Per the 12/01/82 report of Dr. Ward the claimant was initially able to return to her former job after this injury and resulting surgery. After a second injury in 1981 she was unable to return to her former job but was able to do lighter work. The wage records from the Social Security Administration show the claimant was able to return to lighter work and did so up until sometime in 1990. However, these records reflect no wages since 1990. The 05/26/95 report of Dr. Verma notes the claimant was not working at that time. The 07/25/97 re-employment Advisor report of Betty Sparkman indicates the claimant has not worked in at least 2 years. These records support the claimant's contention that she has not worked since 1990. The report of Ms. Sparkman goes on to indicate [that an] active job search with a goal of return[ing] to work does not appear to be a viable option at this time. The claimant made her election on 09/18/85 at which time she was working. After that time her condition, due to this claim, deteriorated to the point [that] she could not return to the lighter work jobs she was doing. This is shown by the report of Ms. Sparkman as well as the 10/20/97 report of Mr. Burr which notes [that] the claimant's 06/05/90 medical disability release was due to her chronic low back condition. Therefore, the claimant has shown the necessary transformation and/or unforeseen circumstances.

"However, per [State ex rel.] McEndree v. Consolidation Coal Co. (1994), 68 O.S.3d 325 [626 N.E.2d 674], the claimant must show actual impaired earning capacity, which includes proof of a desire to earn over the period for which impaired earning capacity is alleged.

"If the claimant can not work at all she is not entitled to an award under 4123.57(A) as she would be alleging a permanent and total disability which is covered under statute section 4123.58. Section 4123.57 is entitled *partial* disability compensation not *total* disability compensation. Partial disability indicates there must be some ability to work. If there is some ability to work then there must also be shown a desire to work. In this case it is found the claimant has not proven his [*sic*] desire to work or earn. There is no evidence of any job search or any attempt to work since 1990. The claimant was not present to testify as to any search or attempts to work. The fact the claimant has been on social security disability since 1990 (per her counsel) also indicates a lack of desire to work. Therefore, the claimant has not proven an actual impairment of earning capacity and the C–86 is denied." (Emphasis *sic*.)

Further appeal was refused. Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission had abused its discretion in denying her change of election. The court of appeals denied the writ, prompting claimant's appeal to this court as of right.

Former R.C. 4123.57 offered two types of compensation: IEC benefits under subsection (A) and compensation based on the percentage of permanent partial disability under subsection (B). Once partial disability was assessed, a claimant chose one of the two forms of compensation. The statute allowed, however, that "for good cause shown," a claimant could change that election. 138 Ohio Laws, Part I, 1733.

"Good cause" requires a showing of "(1) unforeseen changed circumstances subsequent to the initial election, and (2) actual impaired earning capacity." *State ex rel. Combs v. Goodyear Tire & Rubber Co.* (1992), 62 Ohio St.3d 378, 381, 582 N.E.2d 990, 992. Because the SHO found unforeseen changed circumstances, the only issue is the existence of actual IEC. On this question, the commission's order merits further consideration.

A poorly written SHO order hampers review. Among the instances of ambiguity is that surrounding the extent of claimant's disability. While the order initially suggests an inability to do sustained remunerative work, its denial of IEC relies, in part, on the existence of a residual capacity for labor.

The ambiguity at first seems harmless, since the SHO seemingly covered all bases by offering two theories of denial, covering claimants who can and cannot work. Both theories, however, are flawed, which necessitates a clarification of claimant's extent of disability.

The SHO initially declared that a claimant who cannot work cannot receive IEC, "as [she] would be alleging a permanent and total disability." This statement, however, incorrectly assumes that all claimants who cannot work have

a *permanent* disability. It ignores the many workers whose complete inability to work is only temporary.

The SHO's other stated basis for denial was claimant's lack of a desire to earn. This requirement was first discussed in *State ex rel. CPC Group, Gen. Motors Corp. v. Indus. Comm.* (1990), 53 Ohio St.3d 209, 211–212, 559 N.E.2d 1330, 1333:

"R.C. 4123.57(A) requires a comparison of claimant's pre- and post-injury earning capacity. Consideration of post-injury earning capacity assumes, at a minimum, a desire to earn during the period in which an impairment has been alleged. Receipt of compensation for impaired earning capacity when that desire is absent is inconsistent with *Johnson's* [*State ex rel. Johnson v. Indus. Comm.* (1988), 40 Ohio St.3d 384, 533 N.E.2d 775] requirement that a claimant prove *actual* impaired earning capacity." (Emphasis *sic.*)

In concluding that claimant had no desire to earn, the SHO cited claimant's lack of a job search and receipt of Social Security disability benefits. This is problematic because the order strongly implies that claimant is incapable of sustained remunerative employment, and, per *State ex rel. Evenflo Juvenile Furniture Co. v. Hinkle* (2001), 91 Ohio St.3d 74, 742 N.E.2d 124, a job search is not required of claimants who cannot do sustained remunerative employment.

Clarification of claimant's ability to work is, therefore, critical. If claimant cannot work, the commission's reliance on the lack of a job search and receipt of Social Security disability benefits is an abuse of discretion. If she is employable, then the commission's order may well be supported by some evidence.

Two smaller issues can be quickly resolved. Claimant is indeed correct in contending that nonmedical disability factors must be considered in determining IEC. Claimant is also correct in asserting that her motion to change her election alleged an impaired earning capacity from 1983 forward, not 1990, as stated by the appellate court. There is, accordingly, no issue of waiver.

The judgment of the court of appeals is reversed. We order the commission to further consider claimant's motion and issue an amended order.

*Judgment reversed*
*and limited writ granted.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Gloria P. Castrodale* and *James T. Sullivan,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Craigg E. Gould,* Assistant Attorney General, for appellee.

THE STATE EX REL. KILBANE, APPELLANT, *v.* INDUSTRIAL
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Kilbane v. Indus.
Comm.* (2001), 91 Ohio St.3d 258.]

(No. 99–1749—Submitted March 14, 2001—Decided April 11, 2001.)

*Per Curiam.* Leatrice J. Kilbane, appellant, seeks a writ of mandamus directing appellee Industrial Commission of Ohio to vacate its order denying her motion for a settlement hearing and to grant her this request. The court of appeals denied the writ, holding that Kilbane was not entitled to a settlement hearing based either on the hearing provisions in former R.C. 4123.65 or the proscription in Section 28, Article II of the Ohio Constitution against retroactive laws. On Kilbane's appeal as of right, we affirm.

Kilbane was diagnosed with an occupational disease in 1991 that resulted from her employment with appellee Ohio Department of Commerce, Division of Liquor Control, and her workers' compensation claim was allowed for "bilateral heel spurs." In 1997, she moved for a hearing on the issue of settling her claim, arguing that R.C. 4123.65 as it existed on the date of her injury applied.[1] The commission denied her motion mainly because the right to a hearing provided in the 1991 version of R.C. 4123.65 constituted merely a remedial right and, therefore, the General Assembly was free to forfeit that right retroactively.

We agree. R.C. 4123.65 was amended in 1993 to remove the provision for Industrial Commission hearings on applications for settlement approval in State Fund claims. 145 Ohio Laws, Part II, 3173–3175. The statute also formerly

---

1. In 1991, R.C. 4123.65 provided:

"Before any final settlement agreement is approved by the industrial commission, application therefor shall be made to the commission. Such application shall be signed by the claimant and shall clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable and the nature of the controversy. Notice of the hearing of such application shall be given to the employee and his representative. Such application shall be heard by the members of the industrial commission or a majority thereof sitting en banc. No member may delegate his authority to hear and determine the matters raised by such application." 1953 H.B. No. 1.

allowed claimants to apply independently for the commission's approval, whereas it now requires the State Fund employer's signed assent to the application and a settlement agreement as a prerequisite.[2]

Kilbane filed her motion for a settlement hearing long after the 1993 amendment took effect but nevertheless contends that it does not apply to her. She argues, in effect, that the laws in force on the date of her injury govern not only her right to workers' compensation, but also the procedural steps through which she pursues her right to that compensation. It is true that Kilbane's entitlement to workers' compensation, being a substantive right, is measured by the statutes in force on the date of her injury, *State ex rel. Brown v. Indus. Comm.* (1993), 68 Ohio St.3d 45, 46, 623 N.E.2d 55, 56; however, the same is not true for laws affecting only the enforcement of that right, *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 107–108, 522 N.E.2d 489, 496–497; and contrary to Kilbane's argument, R.C. 4123.65 is such a remedial law.

The test for unconstitutional retroactivity requires first a determination as to whether the General Assembly expressly intended the statute to apply retroactively. R.C. 1.48; *Bielat v. Bielat* (2000), 87 Ohio St.3d 350, 353, 721 N.E.2d 28, 33; *Wean Inc. v. Indus. Comm.* (1990), 52 Ohio St.3d 266, 268, 557 N.E.2d 121, 123. If no such intent is found, the analysis stops there, and the statute is deemed to be prospective only. That express legislative intent for retroactivity is obvious here because uncodified law makes the 1993 amendment of R.C. 4123.65 applicable to all "pending" claims for compensation, with certain exceptions. Section 7 of Am. Sub.H.B. No. 107, 145 Ohio Laws, Part II, 3200. The amendment thus changed the way the commission reviews applications to settle claims and applies to causes of action, like Kilbane's, that arose prior to the

---

2. R.C. 4123.65(A) now provides:

"A state fund employer or the employee of such an employer may file an application with the administrator of workers' compensation for approval of a final settlement of a claim under this chapter. The application shall include the settlement agreement, be signed by the claimant and employer, and clearly set forth the circumstances by reason of which the proposed settlement is deemed desirable and that the parties agree to the terms of the settlement agreement provided that the agreement need not be signed by the employer if the employer is no longer doing business in Ohio. If a state fund employer or an employee of such an employer has not filed an application for a final settlement under this division, the administrator may file an application on behalf of the employer or the employee, provided that the administrator gives notice of the filing to the employer and the employee and to the representative of record of the employer and of the employee immediately upon the filing. An application filed by the administrator shall contain all of the information and signatures required of an employer or an employee who files an application under this division. Every self-insuring employer that enters into a final settlement agreement with an employee shall mail, within seven days of executing the agreement, a copy of the agreement to the administrator and the employee's representative. The administrator shall place the agreement into the claimant's file."

effective date of the statute. Accord *Van Fossen,* 36 Ohio St.3d at 106, 522 N.E.2d at 496.

When an express intent for retroactivity is found, the second part of the test for unconstitutional retroactivity requires a determination as to whether the law is substantive or merely remedial. The reason is that while Section 28, Article II of the Ohio Constitution denies to the General Assembly the power to pass retroactive laws, the prohibition "has reference only to laws which create and define substantive rights, and has no reference to remedial legislation." *State ex rel. Slaughter v. Indus. Comm.* (1937), 132 Ohio St. 537, 542, 8 O.O. 531, 534, 9 N.E.2d 505, 508. Remedial laws are those that substitute a new or different remedy for the enforcement of an accrued right, as compared to the right itself, *Bielat, supra,* 87 Ohio St.3d at 354, 721 N.E.2d at 34; *Van Fossen, supra,* 36 Ohio St.3d at 107–108, 522 N.E.2d at 497, and generally come in the form of "rules of practice, courses of procedure, or methods of review." *Slaughter,* 132 Ohio St. 537, 8 O.O. 531, 9 N.E.2d 505, at paragraph three of the syllabus; *Van Fossen* at 108, 522 N.E.2d at 497.

The settlement hearing provisions in former R.C. 4123.65 represent just such a course of procedure. They existed as part of the process by which Kilbane, upon qualifying for compensation, enforced her right to receive it. Consequently, those provisions were remedial in nature and may be changed or revoked by the legislature without offending the Constitution.

The court of appeals' judgment denying a writ of mandamus to invalidate the retroactive application of R.C. 4123.65, therefore, is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————

*Garson & Associates Co., L.P.A.,* and *David L. Meyerson,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Gerald H. Waterman,* Assistant Attorney General, for appellee Industrial Commission.

*Lee M. Smith & Associates Co., L.P.A.,* and *Greta M. Kearns,* for appellee Division of Liquor Control.

THE STATE EX REL. CUNNINGHAM, APPELLANT, *v.*
INDUSTRIAL COMMISSION OF OHIO, APPELLEE.

[Cite as *State ex rel. Cunningham v. Indus.
Comm.* (2001), 91 Ohio St.3d 261.]

(No. 99–1933—Submitted March 14, 2001—Decided April 11, 2001.)

*Per Curiam.* Howard Cunningham, appellant, seeks a writ of mandamus to compel the Industrial Commission of Ohio, appellee, to vacate its order denying his application for permanent total disability compensation ("PTD") and to enter an order granting this compensation. The Court of Appeals for Franklin County denied the writ, finding that the commission's order was supported by some evidence and, therefore, not an abuse of discretion. On Cunningham's appeal as of right, we affirm.

Cunningham injured his back in 1982 while working as a pumper for a petroleum company. After that, Cunningham stopped working. He was only fifty-one years old at the time, he was physically able to perform sedentary tasks, and despite having only an eighth grade education, he had accumulated a variety of work experiences, including operating his own service station.

In 1995, almost twelve years later, Cunningham applied for PTD, alleging that he was unable to perform any type of sustained remunerative employment. The commission denied him PTD because he had made no effort to vocationally rehabilitate himself during the many years that he did not work after his industrial injury. Cunningham does not dispute that he did not try to improve his potential for reemployment; he argues only that the commission abused its discretion in expecting him to make the effort before his condition was diagnosed as permanent.

We disagree. PTD is a compensation "of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed." *State ex rel. Wilson v. Indus. Comm.* (1997), 80 Ohio St.3d 250, 253, 685 N.E.2d 774, 777. In *Wilson,* as here, the claimant's age, relatively low medical impairment, capacity to learn, and varied work experience

made him a prime candidate for rehabilitation and reentry into the workforce. But also like Cunningham, that claimant did nothing to rehabilitate himself vocationally for many years and then applied for PTD, representing that he was unemployable. We found no abuse of discretion in the commission's denial of PTD for that claimant, explaining:

"[I]t is not unreasonable to expect a claimant to participate in return-to-work efforts to the best of his or her abilities or to take the initiative to improve reemployment potential. While extenuating circumstances can excuse a claimant's nonparticipation in reeducation or retraining efforts, claimants should no longer assume that a participatory role, or lack thereof, will go unscrutinized." *Wilson*, 80 Ohio St.3d at 253–254, 685 N.E.2d at 777.

The court of appeals found no extenuating circumstances to excuse Cunningham's failure even to attempt vocational rehabilitation, and we concur. Accordingly, the judgment to deny Cunningham a writ of mandamus is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., dissents.

---

*Law Office of Thomas Tootle* and *Thomas Tootle,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Dennis H. Behm,* Assistant Attorney General, for appellee.

DAVIDSON ET AL., APPELLEES, *v.* MOTORISTS MUTUAL INSURANCE COMPANY, APPELLANT.

[Cite as *Davidson v. Motorists Mut. Ins. Co.* (2001), 91 Ohio St.3d 262.]

(Nos. 00–132 and 00–170—Submitted November 29, 2000—Decided April 11, 2001.)

FRANCIS E. SWEENEY, SR., J.   On September 26, 1995, plaintiff-appellee Gerald Davidson sustained serious injuries in an automobile collision caused by the negligence of Gary Cusick.   At the time of the accident, Cusick had in effect a $100,000 liability insurance policy issued by Farmer's Insurance.   Davidson was paid the full policy limit.

He then sought underinsured motorist coverage from his own motor vehicle insurance carrier, defendant-appellant Motorists Mutual Insurance Company ("Motorists").   According to Motorists, appellee made a claim under the uninsured motorist portion of his own automobile policy, which Motorists said it honored.

Seeking additional coverage, Davidson, along with his wife and children, also appellees, turned to their homeowner's policy, issued by Motorists.   Believing that there was additional coverage under their homeowner's policy because it provided incidental coverage for certain vehicles, appellees filed a declaratory judgment action against Motorists, seeking underinsured motorist benefits.

Appellees moved for summary judgment, arguing that they were entitled to underinsured motorist coverage as a matter of law.   Relying on *Goettenmoeller v. Meridian Mut. Ins. Co.* (June 25, 1996), Franklin App. No. 95APE11–1553, unreported, 1996 WL 362089, the trial court found that since the homeowner's policy provided liability insurance for the use of recreational vehicles, the homeowner's policy was, in effect, a motor vehicle liability policy.   Thus, the trial court granted appellees' summary judgment motion and held that Motorists had been obligated to offer uninsured/underinsured motorists coverage ("UM/UIM") under former R.C. 3937.18 and that because Motorists had not offered it, the coverage was in effect by operation of law.

The court of appeals affirmed. Based upon *Goettenmoeller* and the recent decision of *Selander v. Erie Ins. Group* (1999), 85 Ohio St.3d 541, 709 N.E.2d 1161, the court concluded that the Motorists homeowner's policy was a motor vehicle liability policy subject to R.C. 3937.18 and that UM/UIM coverage existed by operation of law.

Upon motion, the court of appeals certified a conflict to this court, finding that its judgment conflicted with the decision from the Ninth District Court of Appeals in *Overton v. W. Res. Group* (Dec. 8, 1999), Wayne App. No. 99CA0007, unreported, 1999 WL 1215138. The cause is now before this court upon our determination that a conflict exists (case No. 00–170) and upon the allowance of a discretionary appeal (case No. 00–132).

The issue presented is whether limited liability coverage for certain vehicles rendered the policy a motor vehicle liability policy, subject to the requirement of former R.C. 3937.18 to offer UM/UIM coverage.[1] For the reasons that follow, we find that the homeowner's policy is not a motor vehicle liability policy and is not subject to former R.C. 3937.18, 145 Ohio Laws, Part I, 210.

Former R.C. 3937.18 requires an insurer to offer UM/UIM coverage whenever an automobile liability or motor vehicle liability policy of insurance is issued. If UM/UIM coverage is not offered, it becomes part of the policy by operation of law. *Abate v. Pioneer Mut. Cas. Co.* (1970), 22 Ohio St.2d 161, 51 O.O.2d 229, 258 N.E.2d 429, paragraphs one and two of the syllabus. Thus, an offer of UM/UIM coverage was required in this case only if the homeowner's policy is a motor vehicle liability policy.

To determine whether the homeowner's policy is a motor vehicle liability policy, we first turn to the language of the insurance contract itself. The homeowner's policy at issue provides:

"COVERAGE E—**Personal Liability**

"If a claim is made or a suit is brought against an 'insured' for damages out of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies, we will:

"1. Pay up to our limit of liability for damages for which the 'insured' is legally liable."

The homeowner's policy then provides exclusions to coverage, including an exclusion relating to the use of motor vehicles by an insured. This exclusion states:

"SECTION II—Exclusions

---

1. The issue raised in the discretionary appeal disposes of the certified question.

"1. **Coverage E—Personal Liability** and **Coverage F—Medical Payments to Others** do not apply to 'bodily injury' or 'property damage':

" \* \* \*

"f. Arising out of:

"(1) The ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an 'insured.' "

The policy then carves out an exception to this exclusion, affording coverage when injuries are sustained or property damage is incurred when using a limited class of vehicles. The policy provides:

"This exclusion does not apply to:

"(1) A trailer not towed by or carried on a motorized land conveyance.

"(2) A motorized conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

"(a) not owned by an 'insured'; or

"(b) Owned by an 'insured' and on an 'insured location';

"(3) A motorized golf cart when used to pay [sic ] golf on a golf course;

"(4) A vehicle or conveyance not subject to motor vehicle registration which is:

"(a) Used to service an 'insured's' residence;

"(b) Designed for assisting the handicapped; or

"(c) In dead storage on an 'insured location' \* \* \*."

The court of appeals found, and appellees continue to argue, that by providing coverage for the above vehicles, the homeowner's policy includes incidental coverage for motor vehicles and is, in effect, a motor vehicle liability policy.[2] For support, the court relied primarily on *Goettenmoeller v. Meridian Mut. Ins. Co.* (June 25, 1996), Franklin App. No. 95APE11–1553, unreported, 1996 WL 362089, and *Selander v. Erie Ins. Group* (1999), 85 Ohio St.3d 541, 709 N.E.2d 1161.

*Goettenmoeller* was the first appellate decision in Ohio that addressed the issue of whether an insurance policy other than a standard automobile insurance policy

2. Appellees further contend that the homeowner's policy is a motor vehicle liability policy because it contains a "residence employee" exclusion, affording protection against liability to employees for injuries occurring in the course of their employment and arising out of the use of a motor vehicle. Because this argument was not raised in either the trial court or court of appeals, we decline to address it. See *Kalish v. Trans World Airlines* (1977), 50 Ohio St.2d 73, 4 O.O.3d 195, 362 N.E.2d 994.

qualified as a "motor vehicle liability policy" for purposes of the requirement to offer UM/UIM coverage under former R.C. 3937.18.[3]

In *Goettenmoeller,* the plaintiff was involved in an automobile accident and sought coverage under her parents' farmowner's policy. The policy included coverage for the insured's dwelling, barns, farm buildings, structures, and equipment, but excluded coverage for bodily injury arising out of the ownership, maintenance, operation, use, loading, or unloading of any motor vehicle owned or operated by, or rented or loaned, to any insured. The exclusion did not apply to bodily injury occurring on the insured premises and arising from the use of a recreational motor vehicle. The court applied the definition of motor vehicle in R.C. 4501.01(B), and found that since "recreational vehicles" were within that definition, the farmowner's policy was a motor vehicle liability policy.

In *Selander,* 85 Ohio St.3d at 544, 709 N.E.2d at 1163, we cited *Goettenmoeller* for the proposition that "[w]here motor vehicle liability coverage is provided, even in limited form, uninsured/underinsured coverage must be provided." Both the Tenth District Court of Appeals and the Fifth District Court of Appeals have relied on that single sentence in *Selander* and the rationale espoused in *Goettenmoeller* to extend UM/UIM coverage to homeowner's policies that provide limited liability coverage for vehicles such as recreational vehicles. See *German v. Wray* (Sept. 3, 1999), Richland App. No. 99CA17, unreported, 1999 WL 770733; *Willis v. Lightning Rod Mut. Ins. Co.* (Sept. 27, 1999), Fairfield App. No. 99CA14, unreported, 1999 WL 976178; *Chuff v. Holland* (Sept. 30, 1999), Licking App. No. 99CA57, unreported, 1999 WL 976231.

Appellant maintains that these appellate decisions are incorrect and that the requirement of former R.C. 3937.18 to offer UM/UIM coverage does not apply, because the homeowner's insurance policy was not a motor vehicle liability policy. Appellant urges us to follow the certified conflict case of *Overton v. W. Res. Group* (Dec. 8, 1999), Wayne App. No. 99CA0007, unreported, 1999 WL 1215138, where the Ninth District Court of Appeals refused to extend UM/UIM coverage under a similar policy.

---

3. R.C. 3937.18 was amended effective September 3, 1997 (after the policy in this case was issued) as follows:

"(L) As used in this section, 'automobile liability or motor vehicle liability policy of insurance' means either of the following:

"(1) Any policy of insurance that serves as proof of financial responsibility, as proof of financial responsibility is defined by division (K) of section 4509.01 of the Revised Code, for owners or operators of the motor vehicles specifically identified in the policy of insurance;

"(2) Any umbrella policy of insurance." Am.Sub.H.B. No. 261, 147 Ohio Laws, Part II, 2377. Subsection (L)(2) was later amended to read as follows:

"(2) Any umbrella liability policy of insurance written as excess over one or more policies described in division (L)(1) of this section." 1999 S.B. No. 57.

We agree with appellant and find that these courts have mistakenly relied on the *Selander* decision and have erroneously extended UM/UIM coverage where none exists. Moreover, upon closer scrutiny, we reject the reasoning employed by the *Goettenmoeller* court and instead find the *Overton* decision to be persuasive.

To begin with, the court of appeals in this case has failed to recognize the inherent differences between the *Selander* decision and the case at hand and has applied language in *Selander* out of context. *Selander* involved a general business liability policy that specifically provided liability coverage for injuries arising out of the use of automobiles (*i.e.*, motor vehicles). The policy generally excluded coverage for liability arising out of the use of motor vehicles, but provided limited coverage for claims arising out of the use of hired or "non-owned automobiles" used in the insured business. The insureds, who were injured in the course of the partnership's business while occupying an automobile owned by a partner, sought underinsured motorist coverage under the policy. The insurer admitted that the policy provided limited automobile liability insurance for hired and nonowned vehicles, but argued that UM/UIM coverage did not apply, since the policy was not issued for delivery with respect to any particular motor vehicle. We rejected that argument and found that the policy was a "motor vehicle liability policy" within the meaning of R.C. 3937.18. In particular, we stated that "[t]he fact that a policy provides liability coverage for non-owned and hired motor vehicles is sufficient to satisfy the requirement of R.C. 3937.18 that a motor vehicle liability policy be delivered in this state with respect to any motor vehicle registered or principally garaged in this state." *Id.* at 544-545, 709 N.E.2d at 1164.

The *Selander* decision is clearly distinguishable from the instant case. In *Selander*, we were construing a general business liability policy that expressly provided insurance against liability arising out of the use of automobiles that were used and operated on public roads. Since there was express automobile liability coverage arising out of the use of these automobiles, we reasoned that UM/UIM coverage was required. That holding comports with the requirement under R.C. 3937.18 that UM/UIM coverage must be offered where the policy is an automobile or motor vehicle liability policy. In contrast, the policy at issue in this case is a homeowner's policy that does not include coverage for liability arising out of the use of motor vehicles generally. Instead, the homeowner's policy provides incidental coverage to a narrow class of motorized vehicles that are not subject to motor vehicle registration and are designed for off-road use or are used around the insured's property.

These distinctions are significant. Clearly, the policy in *Selander* was deemed an automobile liability or motor vehicle policy precisely because there was

express liability coverage arising from the use of automobiles. Furthermore, automobiles, unlike the vehicles listed in the homeowner's policy in this case, are subject to motor vehicle registration and are designed for and are used for transporting people on a public highway. Thus, based on these distinctions, it makes perfect sense to allow UM/UIM coverage in *Selander* but to restrict recovery under a homeowner's policy that provides incidental coverage for a very limited class of motorized vehicles that are neither subject to motor vehicle registration nor designed to be used on a public highway.

Moreover, we never intended *Selander* to be used to convert every homeowner's policy into a motor vehicle liability policy whenever any incidental coverage is afforded for some specified type of motorized vehicle. Instead, *Selander* stands only for the proposition that UM/UIM coverage is to be offered where a liability policy of insurance expressly provides for coverage for motor vehicles without qualification as to design or necessity for motor vehicle registration.

The Ninth District Court of Appeals in the certified conflict case of *Overton v. W. Res. Group* understood this principle. See, also, *Dicke v. Safeco Ins. Co.* (Dec. 13, 2000), Allen App. No. 1–2000–64, unreported, 2000 WL 1824885. The *Overton* court, in construing a similar homeowner's policy, rejected the argument that the policy was in effect a motor vehicle liability policy. The court distinguished the homeowner's policy at issue from the policy in *Selander*, which contained direct liability coverage arising out of the use of automobiles. The court emphasized this distinction when it stated:

"In this case, however, there is no direct liability coverage, even in a limited sense, for motor vehicles. The policy provision above specifically excludes coverage for bodily injury arising out of the use of motor vehicles. While the exclusion described does [not] apply to specific conveyances such as recreational off-road conveyances and golf carts, this incidental coverage is simply not enough to transform a homeowner's policy into an automobile liability policy.

"A homeowner's policy such as the policy at issue in this case cannot be reasonably construed to provide uninsured or underinsured motorist coverage where there is no automobile liability coverage intended by the parties or contained within the policy." *Id.* at 7.

We agree with these principles. Although the homeowner's policy affords limited coverage arising out of the use of certain motorized vehicles, the mere fact that the policy provides coverage for these motorized vehicles does not convert the policy into a motor vehicle liability policy. In that regard, we find that the *Goettenmoeller* decision and its progeny incorrectly extended UM/UIM coverage to homeowner's policies simply because there was some incidental coverage for recreational vehicles.

Furthermore, in extending UM/UIM coverage, the *Goettenmoeller* court did not seem to understand what is meant by the term "motor vehicle liability policy." This court has previously applied the definition of "motor vehicle liability policy" of insurance that is provided in R.C. 4509.01(L), which limits the phase to policies certified as proof of financial responsibility and which applies to vehicles by which persons or property may be transported upon a highway. In applying this definition, we have found that "the financial responsibility laws and the UIM statute are related in purpose and that the General Assembly intended them both to apply only to policies that insure against liability arising from the ownership or operation of 'vehicles' that can be used for transportation on the highway." *Delli Bovi v. Pacific Indemn. Co.* (1999), 85 Ohio St.3d 343, 345, 708 N.E.2d 693, 695. In applying that interpretation to this case, we likewise find that the homeowner's policy here was not a motor vehicle liability policy. Although the covered vehicles may theoretically be used on a highway, they legally cannot, because they are not subject to motor vehicle registration and are specifically designated in the homeowner's policy for off-road use, for use around the insured's property, or for other nonhighway use (*e.g.*, dead storage). In essence, these types of vehicles are covered by homeowner's policies precisely because they are not covered under automobile liability policies, since they are not subject to motor vehicle registration.

In *Cincinnati Indemn. Co. v. Martin* (1999), 85 Ohio St.3d 604, 608, 710 N.E.2d 677, 680, a case involving the insurer's duty to indemnify and/or defend a holder of a homeowner's policy against a wrongful-death claim, we explained the inherent differences between UM/UIM coverage and homeowner's coverage:

"[I]n the case of bodily injury, homeowner's liability insurance is essentially designed to indemnify against liability for injuries that noninsureds sustain themselves, typically while in the insured's home. In contrast, the purpose of uninsured motorist coverage is 'to protect persons from losses which, because of the tortfeasor's lack of liability coverage, would otherwise go uncompensated.'"

It makes perfect sense, then, to include coverage in homeowner's policies for off-road and similar vehicles that are used around the insured premises but to limit UM/UIM coverage to vehicles designed for highway use. Common sense alone dictates that neither the insurer nor the insured bargained for or contemplated that such homeowner's insurance would cover personal injuries arising out of an automobile accident that occurred on a highway away from the insured's premises.

As stated by the California Supreme Court in *Herzog v. Natl. Am. Ins. Co.* (1970), 2 Cal.3d 192, 197, 84 Cal.Rptr. 705, 707, 465 P.2d 841, 843:

"To the extent that [an automobile] is generally and normally used away from the home on streets and highways, it presents hazards not closely associated with

the home, for which other insurance is customarily carried and is generally understood to afford coverage.

"The reasonable expectations of the insurer in a homeowner's policy—as additionally manifested in the type of information sought upon application for such a policy and the relatively small premiums charged—clearly do not contemplate coverage for automobile-related accidents which occur beyond this limited area. Nor do the reasonable expectations of the insured contemplate that his homeowner's policy will provide such extended automobile coverage; other insurance, with a premium commensurate to the increased risks, is available for that purpose, and, as in the case at bench, is customarily obtained by the homeowner." (Footnote omitted.)

With these principles in mind, we find that the incidental coverage provided for those vehicles listed in the exception to the motor vehicle exclusion does not transform the policy into a motor vehicle liability policy. Consequently, we hold that a homeowner's insurance policy that provides limited liability coverage for vehicles that are not subject to motor vehicle registration and that are not intended to be used on a public highway is not a motor vehicle liability policy and is not subject to the requirement of former R.C. 3937.18 to offer uninsured and underinsured motorist coverage.

Accordingly, we reverse the judgment of the court of appeals.

*Judgment reversed.*

MOYER, C.J., RESNICK, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., dissents.

---

*Clark, Perdue, Roberts & Scott, Douglas S. Roberts* and *Glen R. Pritchard,* for appellees.

*Keener, Doucher, Curley & Patterson, L.P.A.,* and *W. Charles Curley,* for appellant.

*Robert W. Kerpsack Co., L.P.A.,* and *Robert W. Kerpsack,* urging affirmance for *amicus curiae* Ohio Academy of Trial Lawyers.

*Boyk, McCulley & Crossmock* and *Steven L. Crossmock,* urging affirmance for *amici curiae* Michael K. and Lori Overton.

*Gallagher, Bradigan, Gams, Pryor & Littress, L.L.P.,* and *James R. Gallagher,* urging reversal for *amicus curiae* Ohio Academy of Civil Trial Attorneys.

*David L. Jarrett,* urging reversal for *amicus curiae* Western Reserve Group.

*Keller & Curtin Co., L.P.A.,* and *Stanley S. Keller; Ross & Hardies, Peter J. Valeta* and *Matthew S. Elvin,* urging reversal for *amicus curiae* National Association of Independent Insurers.